(Decided July 15th, 1859.)

---

LOWMAN CHEW and WILLIAM GOLDSBOROUGH, his committee, *vs.* THE BANK OF BALTIMORE.

Where the defendant omits to demur for multifariousness, the court may, *sua sponte*, take the objection and dismiss the bill, but whether this will be done or not must depend on the nature of the case and the course of proceedings, at the time of the hearing.

Where the trouble and expense which a demurrer for multifariousness, if well taken, would have prevented, have been incurred, and the case is fully presented on the record, the court should not interfere and take the objection *sua sponte*.

Chew & Goldsborough *vs.* The Bank of Baltimore.

A party who sells bank stock and receives a consideration therefor, and gives a power of attorney for its transfer, will not be allowed, in equity, to defeat the rights of parties acquired under the transfer, solely upon the ground of the *legal insufficiency* of the instruments by which it was effected.

A bill of sale of stock, with a power of attorney for its transfer, executed by a *lunatic*, may be avoided by the lunatic in a proceeding instituted for that purpose, and the *bank held responsible* for allowing the transfer to be made under such a power.

From the current of authorities it seems that the acts of lunatics and persons *non compos mentis* are *voidable* and not *absolutely void.*

Lunatics and persons *non compos mentis* are not bound by their contracts, even though no fraud or imposition has been practiced upon them.

Where a bank permits a transfer of its stock to be made under a power of attorney it takes the risk of its *validity;* it is liable in case of a *forged* power, or of one executed by a *feme covert* or an *infant.*

According to the established doctrine the acts of lunatics and infants are treated as analogous, and in this view the transfer of stock under a bill of sale and power of attorney from a lunatic may be avoided.

In all such cases there may be no actual fault on the part of the bank, yet the legal conclusion results from the justice and expediency, in such transactions, of casting the loss on those who can best provide against it.

A bank may refuse to recognize the power of attorney if not satisfied of its entire genuineness, and may require the personal attendance of the party for the purpose of determining such matters of fact as may give rise to disputes.

In this case the transfer of stock, under a bill of sale and power of attorney, executed by a lunatic, was avoided, and it was *held* that the bank should pay *simple interest* on the dividends accrued on the stock since the transfer, from the time the bank *knew* of the lunacy.

APPEAL from the Circuit Court for Baltimore City.

The bill in this case, filed in the court of chancery, on the 15th of February 1849, by the appellants, against the appellee and one Chew Schnebly, alleges, that a writ *de lunatico inquirendo* issued out of the court of chancery, under which, on inquisition taken on the 9th of June 1845, the complainant, Lowman Chew, was found to be a lunatic without lucid intervals, and to have been in the same state of lunacy from his nativity; that under these proceedings the complainant, Goldsborough, was duly appointed the committee of his person and estate; that said Chew is the only child and personal representative of Samuel A. Chew, late of Queen Anne's county,

who died intestate about the year 1840, and, as such only child, was, and is, entitled to the personal estate of said intestate remaining after payment of his debts; that a certain Chew Schnebly, of Washington county, obtained administration upon the personal estate of said intestate, and after paying all debts and expenses of administration, there remained in the hands of said administrator a clear surplus, consisting in part of ten shares of the capital stock of the Bank of Baltimore, each of the par value of $300, and which, at the time of the death of the intestate, and of administration granted upon his estate, were standing in the name of the intestate on the books of the bank; that on application of the administrator to the orphans court of Queen Anne's county, at its August term, in the year 1844, that court ordered and directed the administrator to pay over to the legal representative or representatives of the intestate, the balance of the estate, including any bank stock that may be in his possession, and on the 23rd of that month and year, the administrator, with the permission and consent of the bank, and by an entry on the books of the bank, transferred said shares of stock into his name of Chew Schnebly, and since that time he has, with the consent and connivance of the bank, transferred said stock to some other person or persons unknown to complainants; that the first transfer was not authorized by said order, but, on the contrary, was made fraudulently and against the duty of the administrator; that at or before the time of this first transfer, the bank had in its possession a copy of said order, and well knew and understood that said transfer was made without lawful warrant, and is, therefore, in construction of law, a party to the aforesaid fraudulent act of the administrator, and is liable to the complainants for the consequences thereof; that complainants have been informed that the bank pretends, that at the time of making this first transfer, the administrator, with a copy of the aforesaid order, likewise presented to the bank an instrument of writing purporting to be signed by Chew, whereby, he, in consideration of a large sum of money, alleged therein to have been paid him by said Schnebly, sells and transfers said stock to said Schnebly, and authorises him to transfer the

same on the books of the bank, and on application made, on behalf of complainants, to the bank, they have received from the bank, as copies of said transfer, order and bill of sale, the papers filed as exhibits with the bill; that complainants do not know, and cannot admit, that said bill of sale was signed, sealed or delivered by Chew, and put the defendants on proof of its execution, if that shall be deemed necessary to their defence. The complainants further charge, that at the date of said paper, and for many years before, and ever since, Chew was, and has been, a lunatic of unsound mind, and without lucid intervals, and, therefore, incapable of binding his interests by any such instrument, and that such his mental imbecility was well known to the bank before and at the time of the transfer first made as aforesaid, and if said paper was, in fact, ever executed by Chew, such execution was obtained by fraudulent practices and undue influence exercised over him by said Schnebly, or some other person or persons in his interest or employment. They further aver, that no part of the sum of money mentioned in said paper, as the consideration for such pretended sale or assignment, was ever paid by the said Schnebly to or for the use of Chew, but on the contrary, at and before the grant of administration to him, Schnebly well knew that Chew was a lunatic and of unsound mind as aforesaid, and incapable of managing or disposing of his property, and complainants are advised, that by reason of such mental imbecility of Chew, said instrument, if ever executed by him, is absolutely null and void, and if said stock still stands in the name of Schnebly it ought now to be transferred into the name of Chew, and if it has been by Schnebly disposed of to persons being or pretending to be purchasers, without notice, Schnebly and the bank ought to be required to procure and transfer into the name of Chew other shares of stock of the bank, equivalent at par to said ten shares of $300 each. The complainants are informed and charge, that ever since the date of said first transfer the bank has divided half yearly dividends of profits of large value, but of what amount in particular, and whether the same have been retained by the bank, or paid over to Schnebly or other person or persons,

they know not, and can only ascertain by discovery of the bank. The bill then prays that the defendants may answer the matters herein charged, and especially may discover whether said stock now stands in the name of Schnebly on the books of the bank, and if not, at what time the same was transferred, and to whom, and in whose name it now stands, and if it stands in the name of Schnebly that he may be compelled to transfer the same to the name of Chew, and if it has been transferred to other persons, then that Schnebly and the bank may be compelled to procure, at their cost, and transfer into the name of Chew, stock of the bank equivalent at par to said ten shares of the value of $300 each, and that the bank may likewise be required to account for and pay over to the complainant, Goldsborough, as committee as aforesaid, the dividends of profits of the bank which have been declared on said stock, and such further dividends as may be declared thereon, until such stock shall have been re-transferred as aforesaid, and for general relief.

The bill of sale, order of court and transfer, filed as exhibits with the bill, are as follows:

"*Know all men by these presents*, that I, Lowman A. Chew, of Queen Anne's county, State of Maryland, for and in consideration of the sum of twenty-six hundred and fifty dollars to me in hand paid by Chew Schnebly, of Washington county, and State of Maryland, at and before the sealing and delivery of these presents, the receipt whereof I do hereby acknowledge, have granted, bargained and sold, and by these presents do grant, bargain and sell unto the said Chew Schnebly, ten shares of the capital stock of the Bank of Baltimore, standing in the name of Samuel A. Chew, deceased, to have and to hold the said stock above bargained and sold, or intended to be, unto the said Chew Schnebly forever. And I do hereby constitute and appoint Chew Schnebly my true and lawful attorney, for me and in my name to receive and transfer the said ten shares in the capital stock of the Bank of Baltimore, to himself or any other person. In testi-

mony whereof, I have hereunto set my hand and affix my seal, this 1st day of May 1844.

LOWMAN A. CHEW, 　（Seal.)

Signed, sealed and delivered in the presence of—
*Samuel M. Pettitt.*"

"MARYLAND, SCT:—*Queen Anne's County,*

*Orphans Court,* August Term, 1844.

On application of Chew Schnebly, administrator of Samuel A. Chew, late of Queen Anne's county, deceased, ordered that he pay to the legal representative or representatives of the said deceased, the balance of the estate, including any bank stock that may be in his possession."

"In testimony that the aforegoing is a true copy taken from the minutes of the proceedings of the orphans court of Queen Anne's county, I have hereto subscribed my name and affixed the seal of my office, this 13th day of August, Anno Domini, 1844.　　　　Test,—LEM'L ROBERTS, Reg. Wills."

"4001. Being duly authorised, I do hereby transfer to myself ten shares of the stock heretofore standing in the name of Samuel A. Chew. Witness my hand, this 23rd day of August 1844.　(Signed,)　　CHEW SCHNEBLY, Adm'r. Test:—*Zeb. Waters.*"

" The above is a true copy of transfer on the book of the Bank of Baltimore.　　　ZEB. WATERS, Book-Keeper. *Bank of Balto., July 8th,* 1848."

The answer of the bank, sworn to by its cashier, neither admitting nor denying such of the allegations of the bill as they have no knowledge of, admits the fact of the transfer of the stock upon the demand of Schnebly, and the exhibition and deposit of the order of the Orphans court of Queen Anne's county, and the bill of sale aforesaid, but positively denies all knowledge or notice of the alleged fraudulent practices of Schnebly, or of the want of consideration for said bill of sale, and avers that the transfer of the stock was admitted on the demand of Schnebly in good faith on their part, in reliance upon the legal validity of the documents then produced, and under the full belief that they authorised said transfer, and that they never knew, heard, or suspected, that Chew was a

lunatic until long after the time of said transfer. The answer further states that the stock was transferred by Schnebly on the 24th of August 1844, and that transfers thereof have since been made, so that they cannot tell in whose names any of it now stands, and that the dividends that have been declared thereon, have since been duly and regularly paid to the persons in whose names the stock stood at the time without notice, actual or constructive, of any claim thereto by any other person or persons.

It having been charged, by a supplemental bill, that Schnebly resides out of the State, an order of publication issued, and failing to answer a decree taking the bill *pro confesso* as against him, was passed on the 23rd of June 1853.

The cause was subsequently transferred to the Circuit court for Baltimore city, and was submitted as against the bank upon bill, answer, and the admissions:

1st. That the copy of the bill of sale, exhibited with the complainant's bill, is a true copy of the original, and that the same may be read in evidence by either party, and shall have the same effect as if the original thereof was produced and its execution duly proved.

2nd. That at the time of the execution of said paper, and of the transfer of the stock mentioned therein, and for some time prior thereto, the said Lowman Chew was *non compos mentis,* and it is agreed that, at the hearing of this cause, either party may read in evidence the proceedings on the petition in lunacy, against said Chew, and that a decree for the complainants as against the bank shall be entered as by consent, so that the cause may be expedited on appeal.

The proceedings in lunacy referred to, sustain the allegations of the bill in regard to them, and show that Chew was about twenty-three years of age on the 9th of June 1845, the time of taking the inquisition.

On the 1st of June 1855, the court (KREBS, J.) passed a decree that the defendants, or one of them, forthwith transfer or cause to be transferred, to the complainant, Chew, thirty shares of the stock of the bank, of the par value of $100 each, and account for the dividends thereon since the 23rd of Au-

gust 1844, to the time of the transfer directed to be made, and referring the case to the auditor to state the account.

From this decree the bank appealed, and, after the cause was argued, in part, in the Court of Appeals, that court, on the 22nd of May 1857, by agreement of counsel, remanded the case for further proceedings, without reversing or affirming the decree.

Testimony of many witnesses was then taken on the part of the complainants, very clearly showing that during his whole life, Lowman Chew was of unsound mind, incapable of making a valid contract, and that his whole appearance, language and conduct, showed imbecility of mind, if not idiocy, which any one of ordinary observation could detect at once; that he was subject to frequent and furious paroxysms of maniacal excitement, which increased in frequency and violence with increasing years, and he has been confined in Mount Hope Hospital, as a lunatic, since the 15th of November 1849.

The cause having again been submitted for hearing, the court, on the 4th of June 1858, passed a decree dismissing the bill as against the bank, and from this decree the complainants appealed.

After the appeal was taken, the bank, by its solicitor, filed a copy of the docket entries in a suit in the Circuit court for Queen Anne's county, upon the administration bond of Chew Schnebly, brought in the name of the State for the use and at the instance of the trustee of Lowman Chew. These entries show that the suit was instituted at November term 1845, of that court, and, under a demurrer to the replication filed at November term 1848, was continued from that time from term to term, till November term 1856, when it was again continued, that being the last entry in the case.

The cause was argued before Le Grand, C. J., Eccleston Tuck and Bartol, J.

*Jervis Spencer* and *Thos. S. Alexander,* for the appellants.

There were no exceptions filed in the court below to the

averments of the bill, and since the Act of 1832, ch. 302, it is too late to raise them in this court. But the bill is not liable to any of the objections urged against it by the appellee. It is not multifarious, and if it be, the objection should have been raised by *demurrer.* It is true that in some cases, and under special circumstances, the courts will, in their discretion, notice this objection *sua sponte*, but there are no such peculiar circumstances in this case as would justify the exercise of such a discretion, and warrant the court now, after the case has, with great expense and delay, been brought to final hearing, in dismissing the bill *in toto* on account of multifariousness. Nor, it is submitted, is there any force in the objection, that there is a variance between the allegations of the bill and the proof, so far as the bank is concerned. The bill alleges that Schnebly procured the execution of the bill of sale by undue influence and fraud, and that, by *construction of law*, the bank is responsible for permitting the transfer, by reason of the lunacy of Chew at the time. Both these allegations are fully sustained by the proof. The fraud *in fact* as against Schnebly is established by the decree *pro confesso*, and the lunacy of Chew, at the time of the bill of sale and of the transfer, is established, both by the admissions in the case, the inquisition of lunacy, and the oral testimony of witnesses, and this, we shall contend, renders the bank responsible in law. Though the bill does not charge fraud in fact as against the bank, it is yet impossible to say there was not gross delinquency and gross negligence on the part of the bank and its officers in this transaction, and gross negligence is fraud in law and must be fraud in morals. 2 *Hare*, 257, *West vs. Reid.* If the bank officers had done as their duty required and as they ought to have done, and had Chew brought before them when the transfer was made, they could not have failed to see his imbecility, for it was apparent to every observer. They, however, chose to act upon a power of attorney, without any inquiry or production of the lunatic before them, not observing even that degree of diligence, as to identity and capacity, which they usually exercise in cases of checks where the payees are not known to them.

Having thus disposed of the objections to the form of the proceedings, we shall proceed to consider the law of the case, and on this we insist: ·

1st. That even conceding, for the sake of the argument, that the incapacity of Chew did not, of itself, avoid the transfer, still the power of attorney and the order of the orphans court, neither singly or together, authorised the transfer as it was made. As *administrator*, Schnebly had no power to sell and transfer the stock, without an order of the orphans court, and a sale and transfer by him *as administrator*, without such order was void. *Act of* 1843, *ch.* 304. 4 *Md. Rep.*, 352, *Mayor & C. C. of Balto. vs. Norman.* This order here relied on, only directs him as administrator, "to pay to the *legal representative*" of the intestate, and cannot be construed to authorise a transfer of the stock into *his own name.* It was an order of *distribution*, and not an authority to sell or transfer. The *power of attorney* was not properly executed by this transfer, and the transfer, therefore, cannot be said to have been made under it. A power of attorney must be executed in the *name* of *him* who *gives the power*, and *not* in the name of *the attorney. Paley on Agency*, 180, in 28 *Law Lib.*, 78. The power should have been executed in this form: "Lowman Chew by Chew Schnebly," or, at least, "Chew Schnebly as attorney for Lowman Chew," whereas, the transfer is signed "*Chew Schnebly, Admr.*"

2nd. The bill of sale and power of attorney proceeding from one wholly without reason, were *absolutely void*, and the transfer by the bank, therefore, wholly without authority; or if not absolutely void, they were at least *voidable*, and it is immaterial for the purposes of this case whether they be considered in the one light or the other; for the only distinction between a void and a voidable act is, that the former may be taken advantage of by a stranger in a collateral action, whereas in the latter a suit must be instituted directly for avoiding it, and such is the very object of that bill in the case, filed by the lunatic himself and his committee. 1 *Md. Rep.*, 39, *Key vs. Davis.* Chancellor Kent in 2 *Com.*, 450, says: "The contracts of lunatics are generally *void* from the period which

the inquisition finds the lunacy to have commenced," and in 1 *Livermore on Agency*, 25, 26, it is held, that a letter of attorney by a lunatic is *merely void*. An idiot or lunatic cannot contract marriage, because marriage is a civil contract, the basis of which is consent, which idiots and lunatics are incapable of giving, and therefore of entering into that *or any other contract*. *Shelford on Lunacy*, 446. Idiots and lunatics are incompetent to contract by the law of England, which in this respect, is conformable to the civil law; *furiosus nullum negotium gerere potest quia non intelligit quod agit*. *Shelford*, 242. To the same effect is *Stock on the law of non compos mentis*, 23, in 25 *Law Lib.*, 15; 1 *Story's Eq. secs.*, 224, 225, *Chitty on Cont.*, 135; 2 *Salk.*, 427, *Thompson vs. Leach;* 2 *Vernon*, 412, *Clerk vs. Clerk;* 10 *New Hamp.*, 156, *Davis vs. Lane;* 3 *Mod.*, 310, *Thompson vs. Leach;* 3 *Carr. & Payne*, 1, *Sentance vs. Poole;* 6 *Blackf.*, 240, *Jenners vs. Howard;* 6 *Barr.*, 373, *Rogers vs. Walker;* 2 *Strange*, 1104, *Yates vs. Boen;* 3 *Camp.*, 126, *Faulder vs. Silk;* 3 *Brown's Ch. Rep.*, 443, *Att'y General vs. Pranther;* 9 *Sme. & Mar.*, 102, *Fitzgerald vs. Reed; Conference Rep.*, ( *N. C.*,) 503, *Millison vs. Nicholson;* 1 *Bland*, 384, *C. D. Owing's case;* 3 *Blackf.*, 52, *Harbison vs. Lemon;* 2 *Kent.*, 451. These authorities are strong in support of the position, that this bill of sale, with the accompanying power of attorney, is *absolutely void*, and if they do not go to this extent, they fully establish, that it is voidable, and may be avoided by the lunatic upon a proceeding instituted by himself and his committee directly for that purpose; the old doctrine, that a man shall not be heard to stultify himself, having been long since properly exploded as being manifestly absurd and against natural justice.

3rd. It was the duty of the bank to know the competency of the authority under which the transfer was made, and having neglected the necessary means for that purpose, has no adequate defence. In every case in which lunacy may be relied on as between the lunatic and his alienee, he may rely upon it as against a purchaser from his alienee in a proceeding directly to invalidate the transaction. The lunatic's case is

made out *prima facie* by proof of lunacy, and it is for the bank to show, even according to the cases cited by its counsel, if they can be regarded as law, the circumstances, if any, which would, notwithstanding the lunacy, make the contract valid. There are no such circumstances in this case. The bank should show, not only that the lunacy was latent, but that its officers have used reasonable diligence on their part to find it out. This they have not done. But it is said the bank stands in the shoes of a purchaser for a valuable consideration without notice. Suppose it does? Still, such a purchaser is bound to guarantee that his grantor, when acting under a power of attorney, does not exceed that power, that the power is valid, that he is not a bankrupt, an insolvent, a *feme covert*, an infant, and not falsely personated, why not then in the case of a lunatic to warrant and guarantee his sanity? But the bank is not a purchaser for value; it is but an incorporated partnership. Its obligations are that the stock shall not be permitted to be transferred or disposed of without the consent of the owner, and it is bound to take notice of every one who attempts to transfer the stock standing on its books. It pays a *forged* check at its peril. In the case of a transfer or check, drawn by a married woman, the bank is bound to take notice of the *coverture*. So in the case of an *insolvent* and an *infant* it is bound to answer to the trustee and the infant after he attains age. 1 *Md. Ch. Dec.*, 407, *Albert & Wife, vs. Savings Bank of Balto.* It then relies upon the consideration set out in the bill of sale, but it does not pretend that this consideration was actually paid to Chew. The statement in the deed, that the consideration was paid, is of the lowest grade of evidence even as between grantor and grantee, and in the case of *Hildreth vs. Sands*, 2 *Johns. Ch. Rep.*, 35, cited on the other side, it is decided, that where a creditor calls on grantor and grantee assailing the deed for fraud, the former must show *some evidence* of the consideration, other than the statements of the deed itself. The bank therefore, before it can escape responsibility on this ground, must offer some proof that the consideration stated in this bill of sale was paid to Chew, which it has utterly failed to do.

Chew & Goldsborough *vs.* The Bank of Baltimore.

*Jonathan Meredith* for the appellee.

1st. The bill is multifarious because, 1st, the defendants are disconnected as to many of the charges in the bill; 2nd, it seeks to enforce different demands against the defendants; 3rd, there is no privity or common interest between the defendants, and 4th, the defences of the defendants stand upon different grounds. The bill undertakes to charge *actual fraud* against Schnebly, and *connivance* in that fraud on the part of the bank. The joinder of the parties was, therefore, in the first instance, proper, but the answer of the bank denying the fraud on its part, and there being no proof on this point, *sunders it* from Schnebly; for if fraud is gone there are no allegations in the bill on which it can be sustained as against the bank. If they rely on the charge of negligence, then the lines of defence of the two parties are entirely different. Again, there are two claims, one joint and the other several, included in the bill—one against both defendants for a re-transfer of the stock—the other against the bank alone for an account of dividends. For these reasons the bill is multifarious. 2 *Ves. Jr.*, 323, *Harrison vs. Hogg. Ibid.*, 486, *Dilly vs. Doig.* 18 *Ves.*, 72, *Saxton vs. Davis.* 2 *Anst.*, 469, *Ward, et al., vs. Duke of Northumberland, et al. Hard.*, 337, *Berke vs. Harris, et al.* 5 *Gill*, 359, *White, et al., vs. White.* 1 *Jacob*, 151, *Salvidge vs. Hyde.* 2 *Sch. & Lef.*, 367, *Whaley vs. Dawson.* 2 *Mason*, 181, *West vs. Randall, et al.* 5 *Paige*, 65, *Boyd vs. Hoyt.* And notwithstanding the defendants have not demurred, the court will, at the hearing, take the objection *sua sponte*, or when alleged *ore tenus*, and dismiss the bill *in toto*, especially where it has been so framed, as, in this case, to preclude a demurrer. 1 *Mylne & Keene*, 546, *Greenwood vs. Churchill.* 2 *Mason*, 201, *West vs. Randall, et al.* 5 *Gill*, 376, 382, *White, et al., vs. White.* 1 *Dan'l Ch. Pr.*, 451.

2nd. The bill ought to be dismissed as against the bank on the ground of variance, the charges against it being wholly unsupported by proof. The bill charges fraud in fact both as against Schnebly and the bank, for it alleges that Schnebly fraudulently obtained the papers on which the transfer was

made, and fraudulently procured the transfer, and that this was done with the consent and *connivance* of the bank, and that the bank *well knew* and *understood* at the time, that the transfer was made without *lawful warrant*. This amounts to a charge of fraud as against the bank, for a *conniver* is *guilty* of that which he could prevent. It amounts to more than a charge of negligence or an omission of duty, and where fraud is charged and is disproved, or not established, the bill cannot be used for any secondary or inferior kind of relief, but must be dismissed at once. Now the answer of the bank utterly denies all fraud, and the complainants being thus put upon proof of the allegations of their bill, have utterly failed to establish this charge of fraud, and the bill should therefore be dismissed. 2 *Dan'l Ch. Pr.*, 419. 2 *Phillips*, 255, *Ferraby vs. Hobson. Ibid.*, 310, *Glasscott vs. Lang.* 3 *Jones & La Touche*, 224, *Maguire vs. O'Reilly.* 2 *Sch. & Lef.*, 10, *Lindsay vs. Lynch*, and *note (a.)* 7 *Eng. Law & Eq. Rep.*, 259, 260, *Price vs. Berrington.* 5 *Ves.*, 452, *Legh vs. Haverfield.* 1 *Bland*, 236, *Lingan vs. Henderson.* 6 *H. & J.*, 29, *Chalmers vs. Chambers.* 1 *H. & G.*, 11, *Ringgold vs. Ringgold.* 6 *G. & J.*, 199, *Evans vs. Iglehart.* 7 *G. & J.*, 155, *Boteler & Belt vs. Brookes.*

3rd. The decree, *pro confesso*, against Schnebly, cannot, in any manner, prejudice or affect the defence of the bank. 1 *Bland*, 236, *Lingan vs. Henderson.* 2 *Johns. Ch. Rep.*, 43, *Hildreth vs. Sands.*

4th. A contract with a lunatic is not absolutely *void*, but *voidable* only. 4 *Rep.*, 123, *Beverley's Case.* 2 *Bl. Com.*, 290. 2 *Kent*, 451. 3 *Burr*, 1794. *Zouch vs. Parsons.* 1 *Md. Rep.*, 32, *Key vs. Davis.* 1 *J. J. Marshall*, 236, *Breckenridge's Heirs vs. Ormsby.* 13 *Mass.*, 239, *Oliver, et al., vs. Houdlet.* 5 *Pick.*, 217, *Wait vs. Maxwell.* 14 *Johns.*, 124, *Jackson vs. Burchin.* 2 *Cowen*, 552, *Jackson vs. Gumaer.* 10 *Pet.*, 58, *Tucker, et al., vs. Moreland.* In 3 *Burr.*, 1804, it is said, that a *mere power* of attorney by a lunatic or an infant is absolutely void. But that principle does not apply to a case where, as here, the power is *coupled with an interest*, so that it can be exercised in the name of the

agent. 10 *New Hamp.*, 160, *Davis vs. Lane*. All the authorities decide that such a power is *voidable only*. That this is such a power is also clear: it is *embodied* in a *bill of sale* conveying stock from grantor to grantee, and the latter had therefore an *interest* in its execution. 2 *Mason*, 249, *Hunt vs. Rousmaniere*, and same case in 8 *Wheat.*, 203. But even if the transfer was *void* as against the lunatic, still the transferee or purchaser of the stock, *bona fide*, for value and without notice of the lunacy could not be held accountable. *Fisher on Mortgages*, 298. 7 *Johns. Ch. Rep.*, 150, *Field vs. Schieffelin*. In this case so much more ought the bank, dealing fairly and without knowledge in a matter in which it had no interest, to be protected. 5 *Gill*, 336, *Farmers & Mechanics Bank vs. Wayman & Stockett*.

5th. It being admitted that the bill of sale, containing the power to transfer the stock, was executed by Chew, Schnebly had a legal right, upon the production of that bill of sale and power, in the absence of all fraud and unfair dealing on his part, to demand of the bank a transfer of this stock. 2 *Wms. Excrs.*, 900, *(note.)* 3 *Binney*, 562, *Wilson vs. Wilson*. 6 *Ves.*, 276, *Gibson vs. Jeyes*. *Ibid.*, 625, *Lacey, Ex-parte*. 9 *Ves.*, 244, *Coles vs. Trecothick*. 3 *Merivale*, 208, *Downes vs. Grazebrook*. 10 *New Hamp.*, 158, *Davis vs. Lane*. 2 *Mason*, 244, 249, and 8 *Wheat.*, 174, 203, *Hunt vs. Rousmaniere*. 10 *Barn. & Cress.*, 731, *Gaussen, et al., vs. Morton*. 4 *Camp.*, 272, *Watson vs. King*.

6th. Although at the time of the execution of this bill of sale, and of the transfer of the stock mentioned therein, and for some time prior thereto, Chew was *non compos mentis*, as is admitted, and, although this bill of sale was fraudulently obtained by Schnebly, still the bank, having no notice, actual or constructive, of the mental incapacity of Chew, or of the fraud of Schnebly, was justified in permitting the transfer. The bank was but a mandatory, and ordinary diligence, only, was required of it. *Story on Bailments, secs.* 137, 173, 178. There is nothing in the proof to show that the bank had the slightest notice of Chew's lunacy or of Schnebly's frauds, and it cannot be affected with notice. 11 *Ves.*, 482, *M'Queen*

40     v. 14.

*vs. Farquhar.* 2 *Atk.*, 275, *Hine vs. Dodd.* 2 *Hare,* 249, *West vs. Reid.* 9 *Hare,* 449, *Hewitt vs. Lossemere.* 2 *Anst.,* 432, *Plumb. vs. Fluitt.* 1 *Hare,* 43, *Jones vs. Smith.* 2 *Brown's Ch. Rep.,* 391, *Cothay vs. Sydenham.* 6 *Ves.,* 174, *Evans vs. Bicknell.* 7 *John's Ch. Rep.,* 150, *Field vs. Schieffelin.*

7th. On the bill, answer, evidence and admissions in this cause, the bank is, in equity and good conscience, exonerated from all liability for or on account of the transfer of the stock mentioned in the proceedings, and is entitled to an affirmance of the decree appealed from. In *Niell vs. Morley,* 9 *Ves.,* 478, it was decided that a *court of equity* will not interfere to set aside a contract, on the ground of lunacy at the time it was made, if it was fair and *without notice,* especially where the parties cannot be reinstated. In *Molton vs. Camroux,* 2 *Wels., Hurls. & Gor.,* 487, it was held that where a person, apparently of sound mind, and not known to be otherwise, enters into a contract which is fair and *bona fide,* and which is executed and completed, and the property, the subject matter of the contract, cannot be restored, so as to put the parties in *statu quo,* such contract cannot afterwards be set aside, either by the alleged lunatic or those who represent him, and this decision was affirmed in error by the court of Exchequer Chamber, in 4 *Wels., Hurls. & Gor.,* 16. In *Price vs. Berrington,* 7 *Eng. Law & Eq. Rep.,* 254, the court refused to interfere and set aside a conveyance, twenty-seven years after the transaction, on the ground of lunacy alone, in the absence of proof of fraud. See, also, 2 *Clark & Finnelly,* 634, *Howard vs. Digby.* 5 *Beav.,* 325. 6 *Beav.,* 192. 14 *Eng. C. L. Rep.,* 196, *Brown vs. Jodrell.* 2 *Atk.,* 411, *Sergeson vs. Sealey.* 10 *Barr.,* 56, *Beals vs. See.* 10 *New Hamp.,* 160, *Davis vs. Lane.* Applying the principles of these decisions to this case, it is submitted the bank cannot be held responsible for permitting this transfer. But there are other singular facts in this case. This boy's father knew of the utter destitution of his intellect, and yet put no restraint upon him in his lifetime, but died intestate, leaving his whole estate to descend to this child, without appointing even a guardian or

trustee over him. None of his friends interfere for his protection until long after this transfer was made, and when it was impossible to trace the stock. The orphans court of the county where he lived, and where his father lived and died, passed an order directing the delivery over to him *of all the property* in the hands of the administrator. When he was thus dealt with by his friends, and the court, whose duty it was to protect his interests, and who must have known of his imbecility, if it existed, it would be unjust and harsh in the extreme, to hold the bank, an innocent party, without notice of his lunacy, and acting in good faith and with reasonable diligence, in a matter in which it had no interest, responsible.

8th. But, in any aspect of the case, there can be no decree against the bank, unless the appellants show that they have, with due diligence, prosecuted their claim against Schnebly and his sureties upon his administration bond, and that the remedy therein is exhausted. *5 Gill*, 355, *Farmers & Mechanics Bank vs. Weymond & Stockett. Barnardiston*, 324, *Harrison vs. Pryse.*

Tuck, J., delivered the opinion of this court.

This is a very important case, as well on account of the doctrines of equity governing the affairs of persons of unsound mind, as because, by their application at this time, loss must fall on one of two innocent parties, in consequence of the fraudulent conduct of another, who took advantage of the mental imbecility of the complainant, to whom, as well by legal duty as by his unfortunate condition, he was placed in *loco parentis.*

The material facts are as follows: Samuel Chew left real and personal estate, and an only child, the complainant, who is shown to have been of unsound mind from his infancy, and altogether incapable of managing his affairs, or attending to business. The father died in 1840, and Chew Schnebly, one of the defendants, a near relative of the complainant, obtained administration on his estate. After paying the debts, he, on the 1st of May 1844, obtained from the complainant a paper in the form of a bill of sale for certain shares of stock in the

Bank of Baltimore, that had belonged to his father, on the alleged consideration of two thousand, six hundred dollars, containing, also, a power of attorney to Schnebly to transfer the stock to himself or to others. Afterwards, about the 13th of August of the same year, as we may infer from the date of the certificate to the order, the orphans court passed an order, on the application of Chew Schnebly, directing him "to pay to the legal representative of the deceased, the balance of the estate, including any bank stock that may be in his possession," and, on the 23rd of August 1844, he exhibited these papers at the bank, and made to himself a transfer of the stock, as follows:

"Being duly authorized, I do hereby transfer to myself ten shares of stock heretofore standing in the name of Samuel A. Chew.          (Signed,)          CHEW SCHNEBLY, Adm'r."

The stock has since been transferred to others, and cannot now be traced, as is alleged by the Bank.

On the 15th of February 1849, the complainant, by his committee, filed a bill against Schnebly and the bank, claiming to have the stock replaced, and payment of the dividends accrued since the transfer. The answer of the bank denies fraud and knowledge of the mental condition of Lowman Chew, insisting that it had valid authority to make the transfer. A decree, *pro confesso*, was taken against Schnebly, and, on final hearing, the bill was dismissed as against the bank. The record comes before us on the complainants' appeal from this decree.

Before considering the merits of the controversy, we will dispose of the objections urged against the frame of the proceedings. There is no doubt that where a defendant omits to demur for multifariousness, the court may, *sua sponte*, take the objection and dismiss the bill. But whether this will be done or not, must depend on the nature of the case, and the course of proceedings at the time of the hearing. Without intimating whether the present bill is obnoxious to the objection, we think it is not a case in which the court should interfere. The trouble and expense which the demurrer, if well taken, would have prevented, have been incurred. The case is fully

presented on the record, and the reasons for allowing the objection do not apply. *Story's Eq. Pl.*, sec. 281, and *notes*.

. The second point is made on the supposed variance between the allegations and proof, so far, at least, as the bank is concerned, there being no exceptions taken to the bill, under the Act of Assembly. As we understand the case, the charge of fraud is made against Schnebly alone, though it is alleged that, by construction of law, the bank is responsible for the consequences of the means employed by Schnebly to obtain the transfer, for the reason that the papers presented by Schnebly, and on which the transfer was made, did not show that he had legal authority for doing what he proposed to do. There is no averment that the bank had any agency in procuring the execution of the bill of sale. On the contrary, the procurement is ascribed to Schnebly, and the bank is charged with liability, by reason of the mental imbecility of Chew, rendering that paper null and void. As to the fraud, the case is made out against Schnebly, and against the bank, as to the charges on which its responsibility was said to depend. We do not consider the bill as having charged fraud, in fact, against the bank, and, it is proper to add, that its conduct in the matter is not open to censure on that ground, however incautious its officers may have been in recognizing papers of the validity of which they had no knowledge.

It was contended, on the part of the appellants, that conceding the incapacity of Lowman Chew does not avoid the transfer, the bill of sale, and the order of the orphans court, singly or together, did not warrant the act of the bank. We need not pass upon the arguments based on this view of the case, because, if the transfer was liable to objection only on the ground of the legal insufficiency of these instruments, we suppose that the party who sold the stock, and received the consideration, as Chew must be assumed to have done in this aspect of the question, would not be allowed, in equity, to defeat the rights of others, acquired by the transfer. Having obtained the benefit of the transaction, he could not impeach it, and claim to have the stock replaced for his use. The effect of Chew's incapacity, therefore, is a controlling question,

which it is necessary to decide.   The bank's liability depends upon that circumstance.   And here we may remark that it is immaterial whether the transfer be void, or merely voidable, because, if only voidable, the very object of the proceeding is to annul it, though it would seem, from the current of authorities, that the acts of a lunatic or person *non compos*, are of the latter class, and do not belong to that which the law deems absolutely void.   *Key vs. Davis,* 1 *Md. Rep.,* 32.

There are cases in England to show that such persons are held bound by their contracts, unless fraud or imposition has been practiced, but to this we cannot assent.   The doctrine in this country is the other way, and, as we think, is sustained by better reasoning than the English rule, as announced in some of their decisions.   The effect, in many cases, would be to place lunatics on the same footing with persons of sound mind, with less effective means to protect the injured party against the fraud, for, at law as well as in equity, fraud or imposition may be relied on, without reference to the mental capacity of the parties, except so far as such defect may give weight to other facts from which the fraud may be deduced. The most cautious persons are liable to be deceived and overreached, and all, of whatever degrees of intelligence, may be relieved when the fraud is made to appear.   It would deprive these persons of the protection which the law designs to throw around their helplessness if they were held to the same measure of evidence as others, because, by reason of this incapacity, they have not the same opportunities of reaching the facts and exposing the fraud.   Their weakness would give strength to the other party.   Instead of protecting them, it would arm their adversaries.   The present case furnishes an illustration. Here is a bill of sale of a person confessedly of unsound mind, with no evidence adduced by the defendant of the circumstances attending its execution, and no ability on the part of the complainant to furnish them, however fraudulent they may have been.   The bank stands on this paper and the subsequent transfer, insisting that they are binding, unless it be shown by proof that he was defrauded or imposed upon, a condition with which it is evident he cannot comply, if his want of capacity is not accepted as evidence of the fraud.

There are cases where the courts have declined to interfere. In these, however, as far as we have examined, the lunatic had had the benefit of the contract, and relief was refused, because of lapse of time, the changed condition of the property or other circumstances, and especially where the party appeared to be sane. But these considerations cannot apply here. The case does not show that Chew received one cent for the stock. The presumptions are very strong that he did not. The papers produced by Schnebly, as authority for the transfer, did not warrant it in the form in which it was made, so as to pass the title at law, whatever effect they should have in equity, between parties competent to contract. The bank cannot say that Lowman Chew appeared to be sane, and that there was nothing to excite suspicion as to the state of his mind, for its officers dealt with Schnebly, without even seeing Lowman Chew, and if misled or deceived by Schnebly, the consequences ought not to fall on Chew. It is true, that transfers may be made under power of attorney, but this means a valid power, and the bank takes the risk depending on its execution. The corporation is the custodian of the stock-books, and is concerned to see that all tranfers are duly made, either by stockholders themselves, or by sufficient authority to others. In cases of forged powers, the bank is liable, and so as to the acts of *femes covert* and infants. In all such instances, it may be said that everything appeared to be fair and plain; that the officers did not know the instrument was forged, or that the party was a married woman or an infant, yet the corporation must meet the consequences, because the law declares that forged instruments are void, that married women are not *sui juris*, and that infants are incapable of contracting, except in specified cases. According to the established doctrine, the acts of lunatics and infants are treated as analogous, and, in this view of the present case, the transfer may be avoided. 1 *Md. Rep.*, 43. In all these instances, there may be no actual fault on the part of the bank, but the legal conclusion results from the justice and expediency, in such transactions, of casting the loss on those who can best provide against it. A bank may refuse to recognize the power of attorney if not satisfied of its

entire genuineness. It may require the personal attendance of the party, for the very purpose of determining such matters of fact as may give rise to disputes. Considering the evidence touching the appearance and conduct of Chew, we think this transfer would not have been allowed, if he had offered to make it in person. As the bank has acted without this precaution, and recognized his bill of sale and power, the consequences attach in the same manner as in many other cases where corporations deal with persons in whom they, too late, discover they have misplaced their confidence.

As the decree must be reversed and the cause remanded, it is necessary to give directions as to the allowance of interest. There is not the least pretence for charging compound interest, though simple interest should be paid on the dividends accrued since the transfer, from the time that the bank should have settled with the committee of the lunatic. We are not prepared to say that, in this case, the liability commenced at the filing of the bill, but it may be safely and justly claimed from the time that the bank knew that Chew was of unsound mind at the execution of the bill of sale, and this we may cer- tainly take to have been at the date of the first decree, (1st of June 1855,) which was passed on an agreement of the parties embracing that fact. The bank ought then to have settled the case without further litigation.

<em>Decree reversed and cause remanded.</em>

(Decided July 15th, 1859.)