WOLCOTT *v.* CONNECTICUT GENERAL LIFE-INSURANCE CO.

137  309<br>148  188

1. INSANE PERSONS—CONVEYANCES—VALIDITY.
    A conveyance by an insane person not under guardianship is not absolutely void, but merely voidable.

2. SAME—RATIFICATION—EVIDENCE.
    Evidence examined and *held* to show that an assignment of a land contract by a lunatic was ratified by him after his restoration to reason.

Appeal from Jackson; Peck, J. Submitted January 12, 1904. (Docket No. 16.) Decided July 27, 1904.

Bill by Thomas C. Wolcott against the Connecticut General Life-Insurance Company, Edwin W. Abbott, and others, to set aside certain conveyances, and for an accounting. From a decree for complainant, defendants insurance company and Abbott appeal. Reversed.

*William E. Ware* and *James A. Parkinson*, for complainant.

*Wilson & Cobb*, for defendant company.

*Tarsney & Fitzpatrick*, for defendants Abbott.

MOORE, C. J. This is an appeal from the decree of the circuit court for the county of Jackson, in chancery.

On the 18th of September, 1895, the Connecticut General Life-Insurance Company entered into an executory contract for the sale and conveyance to Thomas C. Wolcott of certain lands. The consideration was to be the sum of $2,600. Appellee went into possession at or about the date of the contract. On the 21st day of January, 1899, complainant was adjudged by the probate court to be insane. The following day he was committed to the asylum, where he remained until the 19th day of April, 1899, when he was discharged as cured. On the 23d day of August, 1899, he was returned to the asylum, and remained there until the 2d day of April, 1900, when he was again discharged, and returned to his family. He paid during the three years that he was in possession of the premises under the contract but $50 on the principal.

On March 2, 1899, appellee's wife, Carrie G. Wolcott, in company with an attorney, went to Kalamazoo, and secured from complainant an assignment of his interest in the contract; and at the same time, and as a part of the same instrument, he consented that the insurance company might convey the premises to the said Carrie G. Wolcott. On or about the 27th day of March, 1899, the insurance company conveyed the premises to her, and at the same time took back her purchase-money mortgage to se-

cure the sum of $1,600, being the balance of the actual consideration. Her deed and mortgage were promptly put on record. No record was made of the original contract with appellee, nor of his assignment to his wife.

During the period of appellee's first incarceration, and from the time of his first return to about the 20th of August, 1899, appellee's wife and family, consisting of one son, resided on the premises. When appellee was released from the asylum on the 19th of April, 1899, he returned to his family, and resided with them until on or about the 20th of August, 1899, when his wife leased the premises for three years to the defendant Charles Pickett. After the leasing of the premises, appellee and his wife and boy removed to a farm belonging to one of appellee's brothers, in Eaton county.

The defendants Abbott, residents of the city of Detroit, became the purchasers of the Jackson county lands on the 6th day of February, 1900, under a warranty deed from Carrie G. Wolcott; the consideration being the sum of $3,000, $1,600 of which was the mortgage from Carrie G. Wolcott to the insurance company, which the Abbotts assumed and agreed to pay. On or about the 1st of September, 1901, the bill in this case was filed by Thomas C. Wolcott to set aside the assignment of March 2, 1899, the deed and mortgage from Carrie G. Wolcott to the insurance company, the deed from Carrie G. Wolcott to the Abbotts, and the lease from Carrie G. Wolcott to the defendant Charles Pickett—all upon the ground of Wolcott's mental incapacity at the time of the making of the assignment of the land contract to his wife. The relations of appellee and his wife not being congenial, they separated on or about the 1st day of April, 1901, and on the 29th day of October, 1901, articles of separation were executed by them, which will be referred to later in this opinion. Defaults were taken against the defendants Carrie G. Wolcott and Pickett for nonappearance. The other defendants answered. Proofs were taken in open court, excepting the testimony of several witnesses which was taken by

deposition, and read upon the hearing. A decree was entered in favor of complainant. The insurance company and the Abbotts have each taken appeals.

Counsel for the Abbotts say the questions arising on this record may, for the purposes of argument, be conveniently grouped under three heads:

1. Was Thomas C. Wolcott of sufficient mental capacity to understandingly execute the assignment of March 2, 1899?

2. Has he approved and ratified the transaction?

3. Did the defendants Abbott have actual knowledge of complainant's interest in the lands, or were they put upon inquiry?

The defendant insurance company contends, in addition to the foregoing:

*First.* That the complainant was not insane at the time he executed the assignment, in the sense that he was incapacitated for business; that long before this transaction took place, and at a time when there was no question as to his sanity, it was arranged between himself and wife and brother William V. Wolcott that the title to the farm in question should be placed in the wife's name, and the execution of the assignment was but the consummation of this arrangement.

*Second.* That the making of the assignment, whereby the title to the farm was placed in the wife, was a transaction in the interest of complainant, and for that reason not void, regardless of the question of complainant's insanity.

In our view of the case we deem it necessary to discuss but two questions: *First.* Was the assignment by the complainant to his wife void, or simply voidable? *Second.* If voidable, has he ratified it?

No guardian was appointed for complainant, though it has already appeared he had been adjudged insane at an earlier date than the assignment. As to the first of these questions, it must be conceded, the authorities are not harmonious. The case of *Riley* v. *Carter,* 76 Md. 581 (19 L. R. A. 489, 35 Am. St. Rep. 443), is a well-considered

case.   Justice Roberts, speaking for the court, said in part:

"In this case a serious question attaches to the right to assign, which involves the right of a lunatic to execute a deed.   The pleadings in the cause concede that Johns H. R. Nicholson at the time of the execution of the two deeds was non compos mentis.   It is contended on the part of the appellants that *Owing's Case,* 1 Bland, 390, and *Corrie's Case,* 2 Bland, 490, have determined that the deed of a lunatic is not voidable, but absolutely void; and they cite *Dexter* v. *Hall,* 15 Wall. 9, as affirming the doctrine of those cases.   But we cannot concur in this view, nor has this court ever so decided.   The Supreme Court, in passing upon the questions under consideration in *Dexter* v. *Hall,* did not have before them the validity of a deed of conveyance, but of a power of attorney.   Infants and lunatics stand very much upon the same plane, so far as courts of equity are concerned, and it has been universally held that the power of attorney of an infant is absolutely void; and so the Supreme Court, in *Dexter* v. *Hall,* held that the power of attorney of a lunatic was void, and rested their decision on the analogy existing between the rights of infants and those of lunatics, and say:

"'In fact, we know no case of authority in which the letter of attorney of either an infant or a lunatic has been held merely voidable.'

"This they could not have said respecting deeds of conveyance, as the reports of the State court contain numerous decisions affirming the view that the deed of a lunatic is not void, but only voidable.   The firm of J. J. Nicholson & Sons had been for a long series of years engaged in the business of banking in the city of Baltimore.   A member of the firm having died, a dissolution of the partnership was the consequence.   Business complications soon followed, and, for the purpose of settling up the affairs of the firm, the surviving partner executed the deeds in question.   In this State it has never been doubted that a debtor in failing or embarrassed circumstances had the right to execute a deed of trust for the benefit of creditors, when he dedicated all his property and estate to the payment of his debts.   The question of a lunatic's authority, under certain circumstances, to execute a valid deed, has on more than one occasion received judicial interpretation by this

court. In *Evans* v. *Horan*, 52 Md. 610, this court,. speaking through the late Justice Miller, said:

" 'The exact question which the record presents is this: Is a deed of bargain and sale of real estate, made upon a valuable consideration, duly acknowledged, and duly enrolled or recorded under our registry acts, void, or merely voidable, by reason of the fact that at the time it was executed the grantor was non compos mentis?' Without advancing or at all sanctioning the broad doctrine that every act of a lunatic or infant is voidable, and not void, we are of opinion that the deed in question does not belong to that class which the law deems absolutely void. This we think has been established as the law of this State, whatever may be the conflict of authority elsewhere. We refer to the cases of *Key* v. *Davis*, 1 Md. 32, and *Chew* v. *Bank of Baltimore*, 14 Md. 299, and the reasoning and authorities cited and relied on by the court in these decisions. The cases of *Wait* v. *Maxwell*, 5 Pick. 217 (16 Am. Dec. 391), *Jackson* v. *Gumaer*, 2 Cow. 552, and *Breckenridge* v. *Ormsby*, 1 J. J.. Marsh. 236 (19 Am. Dec. 71), are directly in point. Many other more recent decisions of the State courts to the same effect might. be cited, but it° is unnecessary, inasmuch as we consider the decisions of our predecessors as having settled the law of Maryland on this subject. A few brief quotations from the opinion in *Key* v. *Davis* will show the grounds upon which the doctrine is rested, and how cautiously it is guarded and limited.

" ' " In England," say the court, " it appears to be well settled as it is in this country, where the common law has not been abrogated by statutory enactments, that the feoffment of a lunatic or idiot, in person, is only voidable, and not void. The reason assigned for this. is that the solemnity and formalities attendant upon livery of seisin, together with the necessary participation of others in the act, and its notoriety, presupposes that the incapacity of the party was not. apparent."

" 'For this reference is made, among other authorities, to the. case of *Thompson* v. *Leach*, Carth. 435. The court then adds:

" ' " In this State it has been adjudged by the court of appeals, in. *Matthews* v. *Ward*, 10 Gill & J. 443, that livery of seisin has been abolished, and that enrollment is equivalent to it and has been substituted in its place. Indeed, the act of 1766 provides for recording: deeds of feoffment, as well as other deeds, and the act of 1715 declares that livery shall not be necessary where a deed is enrolled. The propriety of this decision, and the results to which it leads, no. one can controvert. If the acquiescence of those whose presence and participation, which are necessary to constitute a good livery of seisin, are sufficient to rescue the act of the lunatic from the presumption of being totally void, much more ought the attestation of the magistrates who took the acknowledgment, and the clerk's certificate of enrollment, which accompanies the deed of bargain and sale of the present day, have a similar effect. From this doctrine it.

would seem to follow, as a necessary consequence, that in this State the deed of bargain and sale of a lunatic, where it has been executed with all the usual formalities required by law, and duly enrolled, would in any case, like a feoffment in person, be only voidable, and not void." '

" The view adopted by this court is in accordance with the generally accepted doctrine of numerous decisions of other States. *Riggan* v. *Green*, 80 N. C. 236 (30 Am. Rep. 77); *Miles* v. *Lingerman*, 24 Ind. 387; *Wait* v. *Maxwell*, 5 Pick. 217 (16 Am. Dec. 391); *Hovey* v. *Hobson*, 53 Me. 451 (89 Am. Dec. 705); *Dennett* v. *Dennett*, 44 N. H. 538 (84 Am. Dec. 97); *Eaton* v. *Eaton*, 37 N. J. Law, 108 (18 Am. Rep. 716); *Blakeley* v. *Blakeley*, 33 N. J. Eq. 508; *Snowden* v. *Dunlavey*, 11 Pa. St. 525; *Ingraham* v. *Baldwin*, 9 N. Y. 45; *Breckenridge* v. *Ormsby*, 1 J. J. Marsh. 236 (19 Am. Dec. 71); *Fitzgerald* v. *Reed*, 9 Smedes & M. 94; *Allis* v. *Billings*, 6 Metc. 415 (39 Am. Dec. 744); *Allen* v. *Berryhill*, 27 Iowa, 540 (1 Am. Rep. 309); *Elston* v. *Jasper*, 45 Tex. 409; 1 Chitty, Cont. (11th Am. Ed.) 188; 1 Parsons, Cont. 384, 385."

In a note to 19 L. R. A. 489, it is said:

" It is the settled law in nearly all American courts that the deed of a lunatic who has not been placed under guardianship is not absolutely void, but merely voidable. *Hovey* v. *Hobson*, 53 Me. 451 (89 Am. Dec. 705); *Hovey* v. *Chase*, 52 Me. 304 (83 Am. Dec. 514); *Arnold* v. *Richmond Iron Works*, 1 Gray, 434; *Wait* v. *Maxwell*, 5 Pick. 217 (16 Am. Dec. 391); *Allis* v. *Billings*, 6 Metc. 415 (39 Am. Dec. 744); *Howe* v. *Howe*, 99 Mass. 98; *Seaver* v. *Phelps*, 11 Pick. 304 (22 Am. Dec. 372); *Den* v. *Moore*, 5 N. J. Law, 470; *Breckenridge* v. *Ormsby*, 1 J. J. Marsh. 245 (19 Am. Dec. 71); *Gribben* v. *Maxwell*, 34 Kan. 8 (7 Pac. 584, 55 Am. Rep. 233); *Riggan* v. *Green*, 80 N. C. 236 (30 Am. Rep. 77); *In re Desilver's Estate*, 5 Rawle, 111 (28 Am. Dec. 645); *Yauger* v. *Skinner*, 14 N. J. Eq. 389; *Copenrath* v. *Kienby*, 83 Ind. 18; *Freed* v. *Brown*, 55 Ind. 310; *Crouse* v. *Holman*, 19 Ind. 30; *Somers* v. *Pumphrey*, 24 Ind. 231; *Fay* v. *Burditt*, 81 Ind. 433 (42 Am. Rep. 142); *Schuff* v. *Ransom*, 79 Ind. 458; *Musselman* v. *Cravens*, 47 Ind. 1; *Boyer* v. *Berryman*, 123 Ind. 451 (24 N. E. 249); *Jackson* v. *Gumaer*, 2 Cow. 552; *Ingraham* v. *Baldwin*, 9 N. Y. 45; *Key* v. *Davis*, 1 Md. 32; *Eaton* v. *Eaton*, 37 N. J. Law, 108

(18 Am. Rep. 716); *Pearson* v. *Cox*, 71 Tex. 246 (9 S. W. 124, 10 Am. St. Rep. 740); *Canfield* v. *Fairbanks*, 63 Barb. 461; *Cook* v. *Parker*, 4 Phila. 265."

See, also, sections 395, 396, Buswell on Insanity.

Counsel for complainant insist the assignment was void, and cite *Rogers* v. *Blackwell*, 49 Mich. 192 (13 N. W. 512). It is true, the case decides that Blackwell's deed was void, but at the time the bill of complaint was filed Mr. Blackwell was dead. It does not appear that after making the deed he recovered his reason, but it does appear from the opinion that there was no act of his at any time ratifying this conveyance. In disposing of the case, it was said:

"It is next claimed that the deed from Blackwell to his wife was not void, but voidable; that such conveyances are on the same footing as those of infants. It is undoubtedly true that, had Blackwell recovered his reason, he might have so conducted himself as to have given force and effect to the deed as a valid conveyance. And so he clearly could have taken the requisite steps to have it declared a nullity."

Clearly recognizing, as we think, the doctrine that the deed of an insane man is voidable, but not void.

In the case of *Moran* v. *Moran*, 106 Mich. 8 (63 N. W. 989, 58 Am. St. Rep. 462), Justice LONG, speaking for the court, said:

"The sole reason for avoiding the deed is that, at the time it was given, the plaintiff was incompetent to make it. No guardian had been appointed over him at that time, and none was appointed until 1887. As a record title, the deed of defendant is perfect; but plaintiff's counsel insists that, while a court of equity might set aside the deed, yet the question is one which is triable in a court of law, before a jury, as well. We cannot agree with this contention. The record shows conclusively that no adjudication was had upon the incompetency of the plaintiff until after the deed had been executed. The deed was not, therefore, absolutely void, but voidable. *Wait* v. *Maxwell*, 5 Pick. 217 (16 Am. Dec. 391); *Ingraham* v. *Baldwin*, 9 N. Y. 45; *Carrier* v. *Sears*, 4 Allen, 336 (81

Am. Dec. 707); *Hallett* v. *Oakes*, 1 Cush. 296; *Chew* v. *Bank of Baltimore*, 14 Md. 299; *Hovey* v. *Hobson*, 53 Me. 453 (89 Am. Dec. 705); *Breckenridge* v. *Ormsby*, 1 J. J. Marsh. 236 (19 Am. Dec. 71); *Nichol* v. *Thomas*, 53 Ind. 42; *Eaton* v. *Eaton* 37 N. J. Law, 108 (18 Am. Rep. 716)."

We think the assignment was voidable.

Has the complainant ratified the assignment? At this point we desire to suggest what we deem to be somewhat significant—that, though this bill is filed by the complainant, who is still conducting the litigation, and must possess much information in relation to the important questions involved, he was not a witness in the case. He did not see fit to contradict any of the testimony to which we shall refer later. He was discharged from the asylum as cured April 2, 1900, when he returned to his family. The record shows that he knew he had made the assignment of his interest in the contract to his wife, and of the deed from the insurance company to her. He did not bring this suit until September, 1901. We cannot set out all the testimony, but refer to some of it. Mr. Pringle testified that he had a talk with complainant in April, a little over a month after the assignment was executed, in which the complainant talked fully of the assignment, and that it was all explained to him; that he acted on his own judgment; that his brother wanted him to put it in his wife's name, and offered to advance the money to save the farm, and he thought it the best thing to be done. Mr. Hewett substantiates this testimony. The Mr. Wolcott who advanced the money which was paid to the insurance company when the deed was made was dead when this case was commenced.

Mr. Charles Pickett testified that:

"Complainant and his wife came over to my house to get me to enter into the lease. Complainant said at that time that everything belonged to his wife—even the personal property on the farm. As far as I could see, he was perfectly rational at that time. Have known him since he came onto the farm in 1895. He was just as sane at

that time as he ever was since I have known him. * * *
He remained on the farm until August 10, 1899.  Up to
that time he appeared all right.   I saw nothing out of the
way with him.   They had, before I went there, made
arrangements to leave the place and go to Onondaga.
The complainant stated at the time the lease was made
that the property had been conveyed to his wife.   When
Mr. Hewett came down to prepare the lease, complainant
took part in the negotiations with reference to the lease.
When there was any dispute with reference to the lease,
the complainant came in as a third man."

He told Mr. Pickett, during the negotiations leading up
to the making of the lease, "that he wanted the lease
drawn up with the privilege of selling it, because they
wanted to get rid of it as soon as they could.   Said he was
going to Onondaga.   His brother was going to give him
that place, or going to let him live there."   After the
lease was made, he did what he told Pickett they intended
to do—moved to the brother's farm, in Onondaga.   Mr.
Hewett, who went to the farm to prepare the Pickett
lease, testified in relation to the preparation of such paper:

"I talked with Mr. and Mrs. Wolcott some, with Fred,
and with Mr. Pickett—not very much with the latter.
Mr. Wolcott seemed to do most of the talking with Mr.
Pickett, and would report what the arrangements were—
what Mr. Pickett wanted.   * * *   Mr. Wolcott ap-
peared to be interested in the matter.   He made sugges-
tions with reference to how the lease should be drawn.
* * *   I discovered nothing in his talk or manner indi-
cating that he was in any way irrational.   His suggestions
and talk with reference to the matter and the drawing of
the lease were pertinent and intelligent."

Mrs. Pickett corroborated the testimony of her husband.
Mrs. Wolcott received in the neighborhood of $1,000 in
money.   It appears from the testimony of the son that
much of it was used on the farm in Eaton county for the
support of the family, including the complainant, and for
expenses, and that some of it was paid to complain-
ant.   After this bill was filed, and on October 29, 1901, an
agreement in writing was drawn, signed by complainant

and his wife, in which it was agreed, among other things, as follows:

"Now, therefore, on account of such separation and disagreement, it is hereby mutually agreed, by and between the parties hereto, that said Thomas C. Wolcott does hereby release the said Carrie G. Wolcott from any and all claims or demands, either at law or in equity, which he may now have or hereafter may have against said Carrie G. Wolcott, and the said Carrie G. Wolcott does hereby release and relinquish to the said Thomas C. Wolcott, any and all claims or demands which she now has or may hereafter have as the wife of the said Thomas C. Wolcott, in any lands heretofore or hereafter purchased or owned by him, or any personal estate which he has or may hereafter acquire, and does also release him from all obligations to maintain and support her while she remains his wife."

Without going further into the details, we think the evidence abundant to show ratification.

The decree is reversed, and one will be entered here dismissing the bill of complaint, with costs of both courts.

The other Justices concurred.