DE VRIES *v.* CROFOOT.

1. INSANE PERSONS—CONTRACTS—AVOIDANCE.

A contract for the sale of land madè by an insane person may be avoided by him on his restoration to sanity.

2. SAME—GUARDIANSHIP—EFFECT.

Where the probate court refused to order specific performance of a contract for the sale of land by an insane person, whereupon the parties instituted guardianship proceedings and procured a guardian's sale, the guardian's acts being purely perfunctory and thè proceedings being conducted for the purpose of carrying out the contract, resulting in the sale of the land for an inadequate sum, the proceedings amount to a fraud and a court of equity will treat the entire proceeding as invalid.

3. SAME—TRUSTS—ACCOUNTING.

Where, through fraudulent guardianship proceedings, the lands of an insane person were sold at an inadequate price to defendant, who resold them at a substantial advance to another under circumstances making it inequitable to deprive him of them, the first purchaser will be regarded, in equity, as the trustee of the land and of the proceeds thereof, and will be required to account to the original owner for the amount received.

Appeal from Ottawa; Padgham, J. Submitted January 24, 1907. (Docket No. 103.) Decided April 30, 1907.

Bill by Nicholas De Vries and Henrietta De Vries against James R. Crofoot, Jane B. Crofoot, Hilbert De Kleine, and Alice De Kleine to set aside certain deeds, and for an accounting. From a decree dismissing the bill, complainants appeal. Reversed as to defendants Crofoot, and affirmed as to defendants De Kleine.

*Walter I. Lillie,* for complainants.

*Diekema & Kollen,* for defendants.

OSTRANDER, J.   Complainant Nicholas De Vries owned 40 acres of land, which cost him in 1894 $2,200, and upon which he placed a mortgage of $1,500.   The farm was rented, complainant and his family living upon other land.   In December, 1901, complainant agreed to sell the land at the price of $2,350, the intending purchaser, however, declining finally to take it; not because the price was too great, but for other reasons.   In December, 1901, Nicholas was adjudged insane, and was sent to the asylum for the insane at Kalamazoo.   There is testimony supporting the idea that his mental affliction may be ascribed to his feeling that he was not prospering financially, and that the failure to make the contemplated sale of this land increased his disorder.   In August, 1902, he went home; but he was returned to the asylum in about 30 days, and there remained until August 29, 1904. While so temporarily at his home, and on August 23, 1902, he, his wife joining him therein, entered into a written contract with defendant James R. Crofoot to sell him this 40 acres of land for the sum of $2,350.   He was to pay $50 down, $800 on or before the 24th of the succeeding March, with interest at 3 per cent. per annum, and the interest upon the mortgage from date of the contract, and a deed subject to the mortgage was to be executed by the vendors and possession given to the vendee Crofoot on or before said March 24, 1903.   The 50-dollar payment was made. In April, 1903, Crofoot, the vendee in the land contract, who had gone into possession of the land, petitioned the probate court for an order for specific performance of the contract.   This order was refused upon the ground that the vendor had not been discharged from the asylum as cured at the time he entered into the contract.   Thereupon a son of complainant, who was a practicing physician in Grand Rapids, who was, to some extent, advising his mother and his sister and brothers, who testifies that it was his opinion that the land should be disposed of, that the contract price was a fair one, and

" I wanted my father to live up to the contract made with Crofoot even if he was insane," undertook to have the contract performed .by certain proceedings in probate court under the provisions of chapter 244, 3 Comp. Laws, as amended in 1899 (Act No. 236) and 1903 (Act No. 207). Upon his petition a guardian was appointed. The guardian petitioned for leave to sell the land and invest the proceeds at interest. Leave was granted, and the land was sold at private sale to Crofoot for $850. He made some minor improvements upon the land, and in February, 1904, sold the property to defendants De Kleine for $3,400, which sum was paid in full. Nicholas, who testifies that he has no recollection of the circumstance of executing the land contract and knew nothing about any of the other proceedings until after his discharge from the asylum, seeks to set aside said contract, the guardian's deed, the quitclaim deed which his wife executed under circumstances to be related, and the deed from Crofoot and his wife to the other defendants. He asks for an accounting of rents and profits of the land, and for repayment of certain money paid out by his wife, Henrietta. There is also the prayer for other and further relief.

Defendant Crofoot was cognizant of the purpose of the proceedings which resulted in securing for him the guardian's deed. He understood that complainant's son proposed to secure him the land at the contract price. The representations made by the son, added to the fact that other members of complainant's family were either passive or, apparently, assenting, had the effect of rendering all that was done by the guardian perfunctory. Except for the purpose of making the sale, there was occasion for, and there would have been, no guardian. The guardian did not assume and did not propose to assume the duties and the responsibilities, generally, of a trustee of the property of an insane person. He did not seek for purchasers of the land. He exercised no volition so far as, determining, as guardian, whether it was for the interest

of his ward that the property be sold. Complainant's family was in no difficulty. The son testifies:

"At the time I made this petition it was about six months after the property was sold by my father. He was in the insane asylum, and I did it to clear up the contract he had made six months previous to that time. My mother and brothers on the farm were not hard up. They did not need any help from me or anybody else, and that is the reason I took pay from my mother for expenses down here. I thought she was better able to pay than I was to pay my own expenses. * * * I did this service for Crofoot because I thought it was the best way out of the condition things were in. I did not know there was nearly $1,000 worth of personal property there when I made the petition, but I knew there was enough to run the farm successfully. I knew they had money enough to live on, and that they had means to support themselves and care for themselves."

It is due the son to say that he states his opinion to be that his father was competent to enter into the land contract. But insanity immediately previous and immediately subsequent to the act is established. There is no other evidence of a lucid interval. See 13 Cyc. pp. 573, 752; 22 Cyc. p. 1115. Defendant Crofoot, however, testified that he made the contract, although he knew Nicholas was insane at the time.

Assuming that the record of the proceedings which were taken is, upon its face, regular, it remains that the statute purpose was not the real purpose of those proceedings, and that the real purpose was known to defendant Crofoot. The facts brought to the attention of the probate judge and upon which he acted were not, all of them, true. The petition for appointment of a guardian made by Uilke De Vries sets out that the estimated value of personal estate of his father is $200, and of his real estate $2,250 or thereabouts, subject to a mortgage of $1,500. The petition of the guardian sets out that "the income from said estate in its present condition will not exceed the sum of $10," that the value of the personal estate of his ward which had come to his hands was $215.

His inventory described the personal estate as one horse, another horse, three cows, four yearlings, and these were valued by appraisers at $215. In fact, the guardian knew nothing whatever about the matter except as informed by Uilke De Vries. No one pretends that there was a true inventory and appraisement of the personal property, or that the real estate produced so small an income. It is explained by one of the appraisers tnat what they were doing was finding out what property there was in 1901 instead of in 1903. It appears, also, that the real estate was really valued by the appraisers, subject to the mortgage, at the sum of $1,000, but that it was considered that the dower interest of the widow was worth $150, and so $150 was deducted. It is a fair inference that the $50 paid upon the land contract must have been considered in order to appraise the real estate at $800, as was done. Defendant Crofoot did not pay the guardian $850, the upset price to be obtained at private sale. He paid but $800, and obtained credit for the $50 paid on the contract. He paid, also, 3 per cent. interest upon the $800 and the interest on the mortgage after the date of the contract, as in the contract he agreed to do. He obtained from complainant's wife, without consideration, a quitclaim deed of the land upon the representation that she, having signed the land contract, had obligated herself thereby to convey her interest in the land. Various expenses of the proceeding, upwards of $30 in amount, were paid by Henrietta. The mortgage, which was not due, has not been paid, although Crofoot has procured it to be assigned by the mortgagee and is carrying it at a rate of interest lower than, by its terms, it bears.

It is said for defendant Crofoot that the evidence warrants no conclusion other than that the parties were acting in good faith, there was no desire or intention to defraud the complainant, the land sold for all that it was worth, the price which the owner himself fixed was obtained, the whole matter was, in fact, in his interest, and resulted beneficially to him. In this connection we are told that

the increased value of the land is due to the fact that an electric railway passed this farm at some time after the contract to sell was made by complainant and before the sale was made by Crofoot to the other defendants. We assume that the road was projected before it was built, and that the fact would have affected the action of a guardian who was conserving the estate of his ward. Whatever the intention of the parties to the proceedings may have been, the purpose and the result was to enforce in 1903 a land contract made in 1902 by an insane man, and to divest him of his estate upon the terms of that contract. This contract was in any event voidable. *Wolcott* v. *Insurance Co.*, 137 Mich. 309. It has been avoided if, as we assume, complainant is now sane. His sanity is not questioned in the record. He has not accepted the proceeds of the sale of his land. In the proceedings taken there was lacking, also, the essential elements of official supervision, exercise of official judgment, the moral responsibility of official, fiduciary action. Complainant was not, in fact, represented in the proceedings. No one can say with certainty what sum a guardian charged with that duty could have secured for the land. It is a reasonable conclusion from the evidence that a larger sum could have been secured. We are inclined to the opinion that some care was taken to so value the land that a private sale could be made, under a statute which permits such a sale when the interest of the estate in the land does not exceed, as valued, $1,000. We acquit the son and all others concerned in the probate proceedings of profiting out of what was done. Nevertheless, in equity, if not at law, a fraud was perpetrated, and a court of equity will treat the entire proceeding as invalid. *Encking* v. *Simmons*, 28 Wis. 272; *Helbreg* v. *Schumann*, 150 Ill. 12; 1 Story on Equity Jurisprudence (13th Ed.), § 227; *Tong* v. *Marvin*, 26 Mich. 35. It is the general rule of law that—

"A legal wrong is committed whenever a man is dispossessed of his property against his will; and, if he de-

mands his property back, and does not see fit to name a
compensation for it, it is clear that nobody else can name
one for him.   He cannot be forced to submit to a sale at
other people's estimates of value." *Tong* v. *Marvin*,
supra.

" ' A sale may have been conducted legally in all its process and
forms, and yet the purchaser may have been guilty of fraud, or may
hold the property as a trustee.   In this case the complainants rely
upon no irregularity of proceeding, upon no absence of form.   The
forms of law were scrupulously observed.'   *   *   *   *Jackson* v.
*Ludeling*, 21 Wall. (U. S.) 616.

" Had the question of fraud been before the probate
court in any of these proceedings, and had the complain-
ant been apprised of them, the case might have been
different.   This court would not try over again a case
already tried, nor permit the complainant to litigate mat-
ters which he had notice of and which he had an oppor-
tunity to litigate in the probate proceedings." Bradley,
J., in *Johnson* v. *Waters*, 111 U. S. 668, 669.

See, also, *Encking* v. *Simmons*, supra.   The rule thus
stated is applicable here.   Such a sale will always be set
aside if it is for the benefit of the person non compos men-
tis where injustice will not be thereby done, or where the
parties can be placed in statu quo.   And if defendant
Crofoot were now the owner of this property, such would
be the disposition made of the case.

It is not claimed that the record of the proceedings is in-
firm, or that it carried to defendants De Kleine notice of im-
proper or fraudulent conduct.   It is claimed that certain
circumstances of the manner of their purchase from Cro-
foot and of their subsequent actions furnish grounds for
the inference that they are chargeable with notice of what
was sought to be and was accomplished.   Without deny-
ing the power of the court to compel them to restore the
property and to look to Crofoot for indemnity, we are of
opinion that substantial equity can be otherwise done, and
therefore as to them we affirm the decree.   But the de-
fendant James R. Crofoot should not be permitted to profit
by the transaction.   We treat him as vendee in a void
land contract, who has succeeded in enforcing it, to his

profit, against the will and the interest of the vendor. He occupies, in equity, the position of a trustee of the land and of the proceeds thereof. The proceeds are $3,400 as of date March 5, 1904. From this sum will be deducted $2,350 (the money in the hands of the guardian to be paid to complainant), and $125, the value of the improvements Crofoot placed on the premises. The balance, which is $925, with interest at the rate of 5 per cent. per annum from March 5, 1904, he will pay to complainants, with costs of both courts.

The decree below, as to defendants Crofoot, is reversed, and a decree will be entered in this court in conformity with this opinion. As all defendants joined in the answer to the bill of complaint, and have appeared by the same counsel, no costs of the appeal will be awarded to defendants De Kleine.

BLAIR, MONTGOMERY, HOOKER, and MOORE, JJ., concurred.