**Ricardo HERNANDEZ, Appellant,**

**v.**

**Bryant BANKS and Sheillia Banks, Appellees.**

**Nos. 08–CV–1571, 09–CV–744.**

District of Columbia Court of Appeals.

Argued En Banc June 19, 2012.

Decided May 2, 2013.

---

Aaron G. Sokolow, with whom Morris R. Battino was on the brief, for appellant.

Daniel S. Harawa, Student Attorney (No. 12689), with whom Doreen M. Haney, Supervising Attorney, was on the brief, for appellees.

Julie H. Becker, The Legal Aid Society of the District of Columbia, with whom John C. Keeney, Jr., The Legal Aid Society of the District of Columbia, was on the brief, for The Legal Aid Society of the District of Columbia, AARP Legal Counsel for the Elderly, University Legal Services, Bread for the City, and Washington Legal Clinic for the Homeless, amici curiae, in support of appellees.

Before WASHINGTON, Chief Judge, GLICKMAN, FISHER, BLACKBURNE–RIGSBY, THOMPSON, OBERLY, BECKWITH, EASTERLY, Associate Judges, and RUIZ, Senior Judge.*

BLACKBURNE–RIGSBY, Associate Judge:

We granted appellees' petition for rehearing en banc to consider whether we should continue to follow the rule of *Sulli-*

* Judge Ruiz was a Retired Associate Judge of the court at the time of argument. Her status changed to Senior Judge on July 2, 2012.

*van v. Flynn*, 20 D.C. (9 Mackey) 396 (1892), that the contracts of mentally incapacitated persons are inherently void, or should instead join the majority of jurisdictions in deeming such contracts only voidable.

The background is as follows. Appellant's predecessor-in-interest, 718 Associates,[1] appealed a decision by the trial court determining that it was not entitled to a non-redeemable judgment for possession of property located at 718 Marietta Place, N.W., Washington, D.C. (the "Property"). Appellees Bryant and Sheillia Banks (the "Bankses") contend that they are legally entitled to continue living in the Property by virtue of a lease entered into with the previous owner of the Property, Ms. Patricia Speleos. At trial, 718 Associates argued that appellees' lease was void because Ms. Speleos was mentally incapacitated when she signed the lease. The trial court upheld the validity of the lease, finding that although Ms. Speleos was mentally incapacitated when she entered into the lease agreement, her incapacity rendered the lease voidable at her election, rather than inherently void. The trial court found that the lease had not been disaffirmed by Ms. Speleos or her representatives and therefore did not award possession of the Property to 718 Associates. 718 Associates appealed, and a three-judge division of this court reversed the trial court's decision, holding that *Sullivan* controlled and the lease was inherently void.[2] *718 Assocs. v. Banks*, 21 A.3d 977, 984 (D.C.), *reh'g en banc granted, opinion vacated sub nom. 718 Assocs. Tr. 718 NW Trust v. Banks*, 36 A.3d 826 (D.C.2011). We conclude that the voidable standard better comports with modern contract law and modern understandings of mental illness and therefore overrule *Sullivan* and adopt the majority approach that such contracts are voidable, rather than inherently void.

## I. Background

The Bankses entered into a lease agreement regarding the Property at issue in this case with Ms. Speleos in March 2001. Pursuant to that lease, appellees were obligated to pay $500 per month in rent and were given the exclusive option to purchase the Property at any time for $50,000. In July 1997, 718 Associates purchased a tax sale certificate to the Property for $2,103 and was subsequently issued a tax deed in August 2001. *See* D.C.Code § 47–1304 (1997 Supp.) (providing that when a

---

1. While this appeal was pending before a three-judge division of this court, 718 Associates sold the Property and assigned all rights in the Property to Ricardo Hernandez, the current appellant. While 718 Associates' petition for rehearing en banc was pending, 718 Associates submitted a motion for leave to amend the caption to substitute parties, which we granted. *See Flack v. Laster*, 417 A.2d 393, 400 (D.C.1980) ("Once property or rights have been assigned, the assignee stands in the shoes of the assignor and can sue in his [or her] own name to enforce the rights assigned." (citations and internal quotation marks omitted)).

2. As the three-judge division of this court concluded, *Sullivan v. Flynn*, 20 D.C. (9 Mackey) 396 (1892), remained binding precedent in the District of Columbia. *Sullivan* was decided by the Supreme Court of the District of Columbia sitting in General Term, which is the predecessor court to the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"). *See John R. Thompson Co. v. District of Columbia*, 92 U.S.App. D.C. 34, 36, 203 F.2d 579, 581 (1953) (recognizing the Supreme Court of the District of Columbia in General Term as its predecessor), *rev'd on other grounds*, 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953). Decisions of the D.C. Circuit rendered prior to February 1, 1971, as well as the decisions of this court, "constitute the case law of the District of Columbia" and can be overruled only by this court en banc. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971).

property is not redeemed by the owner following the issuance of a tax sale certificate, a deed shall be given to the tax sale purchaser).

In November 2001, as part of a separate proceeding initiated by Adult Protective Services, Superior Court Judge Kaye K. Christian found Ms. Speleos, who was then eighty-four years old, to be mentally incapacitated as defined by D.C.Code § 21–2011(11) (2001).[3] Pursuant to the finding of incapacity, Judge Christian appointed Stephanie Bradley as conservator of Ms. Speleos's estate and Ms. Speleos's nieces as guardians of Ms. Speleos. *See* D.C.Code §§ 21–2051, –2044 (2001) (appointment of conservators and guardians, respectively). A hearing was later held to determine the status of seven real estate transactions Ms. Speleos had entered into in March 2001, prior to her adjudication of incapacity. Ms. Bradley alleged that Ms. Speleos was already incapacitated at the time of the transactions, in which she purportedly transferred seven properties with tax-assessed values of over half a million dollars for only $41,000 in recited consideration. Judge Christian voided the transactions, but did not rule on the validity of the Bankses' lease, which was also entered into prior to Ms. Speleos's adjudication of incapacity. Instead, Judge Christian noted that another hearing would need to be held to address that lease. However, that additional hearing was never held.

On August 4, 2003, Judge Hiram E. Puig–Lugo found, based on the testimony of Ms. Speleos's conservator and guardians, that Ms. Speleos was mentally ill and was likely to injure herself. *See* D.C.Code § 21–545(b)(2) (2001). For that reason, Ms. Speleos was committed indefinitely to the District of Columbia Department of Mental Health for outpatient treatment. On August 5, 2003, 718 Associates filed suit against Ms. Speleos's estate to quiet title to the Property, claiming that their tax deed divested all interest and title of the Estate and vested good title to the Property in 718 Associates. *See* D.C.Code § 47–1304 (2001). While the suit to quiet title was pending, Ms. Speleos passed away, and her sister, Ann E. Pizzulo, became Personal Representative of the Estate. The suit to quiet title was resolved in October 2006, when 718 Associates and the Estate entered into a settlement agreement, which resulted in 718 Associates obtaining title to the Property. Pursuant to that settlement agreement, the Estate provided an affidavit attesting that there were no valid leases or permissive tenants on the Property.[4]

In April 2008, 718 Associates filed the present action seeking a non-redeemable judgment for possession of the Property

---

3. D.C.Code § 21–2011(11) defines an "[i]ncapacitated individual" as:
 [A]n adult whose ability to receive and evaluate information effectively or to communicate decisions is impaired to such an extent that he or she lacks the capacity to manage all or some of his or her financial resources or to meet all or some essential requirements for his or her physical health, safety, habilitation, or therapeutic needs without court-ordered assistance or the appointment of a guardian or conservator.

4. The affidavit was prepared by an attorney and signed by the Personal Representative of the Estate. The attorney, who also represented the Estate in the settlement agreement negotiations, later testified that she paid a brief visit to the Property and saw a broken-down vehicle in the backyard, broken top-floor windows, and overgrown grass. She did not attempt to knock on the door or deliver written notice to determine whether the Property was occupied. Although at this point Ms. Bradley, the conservator of the Estate, was aware of the Bankses' lease, the attorney representing the Estate testified that she was not aware of the Bankses' lease or occupancy of the Property.

against the Bankses. The Bankses claimed that they were entitled to remain tenants when 718 Associates obtained title to the Property because they had a valid lease with the Property's former owner, Ms. Speleos. 718 Associates challenged the validity of that lease, claiming that Ms. Speleos lacked capacity at the time that she entered into the lease transaction with the Bankses and, as a result, the lease was void.[5] The trial court, Judge Stephanie Duncan–Peters, found that Ms. Speleos was mentally incompetent when she entered into the lease agreement with appellees.[6] The trial court concluded, however, that the lease was voidable, rather than void. Citing *Sullivan v. Flynn*, 20 D.C. (9 Mackey) 396 (1892), the trial court recognized that "[h]istorically, a conveyance or contract by an insane or *non compos mentis* individual was declared void, and not merely voidable." The trial court observed that "the District of Columbia has not considered this particular issue," but did not discuss whether *Sullivan* remained binding precedent in the District of Columbia. The trial judge then examined what she described as the "modern view" that such a transaction is voidable, citing to cases from other jurisdictions[7] and discussing the public interest in protecting incapacitated persons' personal and property rights. After concluding that contracts entered into by mentally incapacitated persons are voidable, rather than void, the trial court found that there was "no ratification or disaffirmance by Ms. Speleos or an authorized representative on her behalf . . . ."[8] The trial court concluded by observing that "[t]he public policy considerations that would give the [c]ourt power to void the lease agreement, namely protection of the incompetent party, are not applicable to [718 Associates, a subsequent purchaser]."

5. 718 Associates also claimed that Ms. Speleos's signature on the lease was forged. The trial court found that Ms. Speleos's signature was not forged, and 718 Associates did not challenge that finding on appeal. In addition, 718 Associates argued that Ms. Speleos lacked the authority to lease the Property to appellees because, 718 claimed, title was transferred before Ms. Speleos signed appellees' lease. The trial court rejected this argument because the deed was notarized after the lease was signed, and 718 Associates did not challenge this finding on appeal.

6. Judge Duncan–Peters based her finding on the following evidence:

(1) Judge Christian's declaration that Ms. Speleos was incompetent to handle her own affairs in November 2001; (2) Judge Christian's decision to void the March 2001 deeds in January 2002; (3) the timing of these deeds, *i.e.*, that they were [ ] entered into no more than a week after Ms. Speleos leased the subject property; (4) Dr. Lowy's testimony that it is highly unlikely that Ms. Speleos was competent in March 2001 (*i.e.*, the year the lease was entered into); (5) Ms. Bradley's [Ms. Speleos's conservator's] pri- or and current testimony regarding Ms. Speleos'[s] state of mind during the relevant time period; and (6) the fact that Mr. and Ms. Banks [appellees] are the only individuals asserting that Ms. Speleos was competent and they have a vested interest in such a finding.

7. *See, e.g., United States v. Manny*, 645 F.2d 163, 166–69 (2d Cir.1981); *Cundick v. Broadbent*, 383 F.2d 157, 159–60 (10th Cir.1967); *Rubenstein v. Dr. Pepper Co.*, 228 F.2d 528, 536–37 (8th Cir.1955); *Trepanier v. Bankers Life & Cas. Co.*, 167 Vt. 590, 706 A.2d 943, 944 (1997).

8. Because the trial court found that the lease had not been disaffirmed, it did not reach the issue of whether equity would have prevented Ms. Speleos, or her representative, from avoiding the lease. *See* RESTATEMENT (SECOND) OF CONTRACTS § 15 cmt. f (1981) ("If the contract is made on fair terms and the other party has no reason to know of the incompetency, performance in whole or in part may so change the situation that the parties cannot be restored to their previous positions or may otherwise render avoidance inequitable. The contract then ceases to be voidable.").

On appeal to the division, although 718 Associates "largely accede[d] to the trial court's determination that the lease was voidable and not void," they did "ask [the division] to find 'that the lease agreement is void in accordance with' *Sullivan, supra,* 20 D.C. (9 Mackey) at 401 (1892) (holding that 'the deed of an insane person is void, and therefore cannot be ratified by acts *in pais*')." [9] *718 Assocs., supra,* 21 A.3d at 981 n. 9. The division concluded that it was constrained to apply *Sullivan* because *Sullivan* remained binding precedent in the District of Columbia and therefore could only be overruled by this court sitting en banc.[10] *718 Assocs., supra,* 21 A.3d at 984 (citing *M.A.P., supra* note 2, 285 A.2d at 312).

## II. Discussion

We begin our discussion by outlining the relevant legal principles governing the contracts of mentally incapacitated persons. We then explain our reasons for overruling *Sullivan* and adopting the voidable rule, as stated in the Restatement (Second) of Contracts, as the law of the District of Columbia.

### A. Legal Background

We granted rehearing en banc to consider whether the rule from *Sullivan,* that contracts entered into by mentally incapacitated persons are inherently void, should continue to be followed in the District of Columbia, or if we should join a majority of jurisdictions and hold that such contracts are voidable. We first address the applicable standard of review and define the void and voidable rules concerning the contracts of mentally incapacitated persons.

### 1. Standard of Review

Because neither this court sitting en banc nor the D.C. Circuit (prior to 1971) overturned or announced a departure from *Sullivan,* it remains the law in the District of Columbia. This court sitting en banc may overrule our predecessor courts' decisions, including common law decisions. *See, e.g., Davis v. Moore,* 772 A.2d 204, 234 (D.C.2001) (en banc) (Ruiz, J., concurring in part and dissenting in part). "[I]n common law cases our task is to carefully consider our own precedents, weigh rulings from other jurisdictions for their persuasive authority, and, guided by judicial doctrines such as *stare decisis* and the uniquely judicial means of case-by-case adjudication, declare the common law of the District of Columbia." [11] *Id.* "The doc-

---

**9.** An "act *in pais* " is an "act performed out of court, such as a deed made between two parties on the land being transferred." BLACK'S LAW DICTIONARY 27 (9th ed. 2009).

**10.** *Sullivan* was followed in *Martin v. Martin,* 270 A.2d 141, 143 (D.C.1970) ("*Martin II* "). In *Martin II,* this court refused to sustain the findings of the trial court—that requests for disability benefits made by Mr. Martin's wife to the Veterans Administration were at the request of Mr. Martin or were ratified by him and were therefore valid—"because of [Mr. Martin]'s adjudicated incompetence at the crucial times." 270 A.2d at 143. We explained that "[a]ppellant, while under that status, was incapable of executing contracts, deeds, powers of attorney, or other instru-

ments requiring volition and understanding." *Id.* (citing *Dexter v. Hall,* 82 U.S. (15 Wall.) 9, 20, 21 L.Ed. 73 (1873), and *Sullivan, supra,* 20 D.C. (9 Mackey) at 401). *Martin II* does not directly control this case because Mr. Martin, unlike Ms. Speleos, had already been adjudicated incompetent at the time of the contract at issue. However, *Martin II* demonstrates that this court relied on *Sullivan* as recently as 1970.

**11.** In their en banc brief appellees argue:

Because both *Sullivan* and *Martin II* concern contracts entered into by persons already adjudicated incapacitated, the precedent set in *Sullivan* and *Martin II* does not govern this case. Neither decision precludes this [c]ourt, under the principle of

trine of *stare decisis* is of course 'essential to the respect accorded to the judgments of the [c]ourt and to the stability of the law,' but it does not compel us to follow a past decision when its rationale no longer withstands 'careful analysis.'" *Arizona v. Gant*, 556 U.S. 332, 348, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) (quoting *Lawrence v. Texas*, 539 U.S. 558, 577, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003)). Furthermore, the doctrine of *stare decisis* "'does not irreversibly require that we follow without deviation earlier pronouncements of law which are unsuited to modern experience and which no longer adequately serve the interests of justice.'" *Carl v. Children's Hosp.*, 702 A.2d 159, 178–79 (D.C.1997) (Schwelb, J., concurring) (quoting *Beaulieu v. Beaulieu*, 265 A.2d 610, 613 (Me. 1970)). Before discussing why *Sullivan* should be overruled, we briefly explain the void and voidable rules as they relate to the contracts of mentally incapacitated persons.

## 2. Void Rule

*Sullivan* held "that the deed of an insane person is void, and therefore cannot be ratified by acts *in pais*."[12] 20 D.C. (9 Mackey) at 401. Although *Sullivan* did not go into such detail, it is generally understood that "[a] void bargain is not a contract at all;" a void "contract" cannot be ratified and therefore does not bind the parties. RICHARD A. LORD, 5 WILLISTON ON CONTRACTS § 10:2, at 278–79 (4th ed. 2009). Because the parties were never bound, the party with capacity can repudiate an agreement even though the incapacitated party has already performed. *Id.* A minority of jurisdictions continue to follow the rule that contracts entered into by mentally incapacitated persons are void.[13]

## 3. Voidable Rule

 A majority of jurisdictions follow the rule that contracts entered into by mentally incapacitated persons are voida-

---

stare decisis, from ruling that contracts entered by those not previously adjudicated incapacitated should be voidable.

This argument is based on a misreading of *Sullivan*. The "inquisition *de lunatico*" (commission of lunacy) in that case occurred after, not before, the execution of the deed in question. *See Sullivan, supra,* 20 D.C. (9 Mackey) at 398. Appellees are correct that *Martin II* involved a person who had already been adjudicated incompetent. *See Martin II, supra,* 270 A.2d at 143.

**12.** We recognize that the use of the term "insane" and other terms used by prior decisions may be offensive to some. However, we quote the original language of cases to ensure accuracy and to highlight society's evolving understanding of mental illness. Furthermore, while we prefer the term "incapacitated" to the term "incompetent," see *infra* note 36, we have retained the terminology used by other courts, including the trial court in this case.

**13.** *See, e.g., Shoals Ford, Inc. v. Clardy,* 588 So.2d 879, 881 (Ala.1991) ("The well-settled law in Alabama is that contracts of insane

persons are wholly and completely void." (citing *Williamson v. Matthews*, 379 So.2d 1245 (Ala.1980), and ALA.CODE § 8–1–170 (1975))). In some jurisdictions, whether a contract is void or voidable depends upon the degree of incapacity. *See, e.g., Fleming v. Consol. Motor Sales Co.*, 74 Mont. 245, 240 P. 376, 378 (1925) (explaining that under Montana law, "[a] person entirely without understanding has no power to make a contract of any kind ... [and] the contract is void ab initio" whereas the contract of "a person of unsound mind, but not entirely without understanding, made before his incapacity has been judicially determined," is voidable) (internal quotation marks and citations omitted); *First State Bank of Sinai v. Hyland*, 399 N.W.2d 894, 896–98 (S.D.1987); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 12 cmt. a (1981) ("Incapacity may be total, as in cases where extreme physical or mental disability prevents manifestation of assent to the transaction.... Often, however, lack of capacity merely renders contracts voidable.").

ble, rather than inherently void. Under that rule, the contractual act of a person later found mentally incapacitated, rather than adjudicated incapacitated or under a guardianship at the time of the contract,[14] is not inherently void but at most voidable at the instance of the mentally incapacitated party, and then only if avoidance is equitable.[15] A voidable contract is presumed valid and legally binding,[16] subject to possible avoidance by the mentally incapacitated party,[17] who must manifest an election to do so.[18] The voidable rule is set forth in the Restatement as follows:

(1) A person incurs only voidable contractual duties by entering into a trans-

14. See *infra* note 36.

15. 5 WILLISTON ON CONTRACTS § 10:3, at 296. *See, e.g., Pappert v. Sargent*, 847 P.2d 66, 69–70 (Alaska 1993); *Young v. Lujan*, 11 Ariz. App. 47, 461 P.2d 691, 693 (1969); *Neale v. Sterling*, 117 Cal.App. 507, 4 P.2d 250, 250 (1931) (observing that contracts made by incompetent persons before a judicial determination of incompetency are voidable by statute); *Green v. Hulse*, 57 Colo. 238, 142 P. 416, 418 (1914); *Doris v. McFarland*, 113 Conn. 594, 156 A. 52, 56 (1931); *Perper v. Edell*, 160 Fla. 477, 35 So.2d 387, 390 (1948); *Holcomb v. Garcia*, 221 Ga. 115, 143 S.E.2d 184, 187 (1965) (observing that "[t]he deed of an incompetent who has never been adjudicated to be of unsound mind is not absolutely void, but only voidable" by statute); *Jordan v. Kirkpatrick*, 251 Ill. 116, 95 N.E. 1079, 1080 (1911); *Aetna Life Ins. Co. v. Sellers*, 154 Ind. 370, 56 N.E. 97, 97–98 (1900); *Breckenridge's Heirs v. Ormsby*, 24 Ky. (1 J.J. Marsh.) 236, 239 (1829); *Hovey v. Hobson*, 53 Me. 451, 453 (1866); *Flach v. Gottschalk Co. of Baltimore City*, 88 Md. 368, 41 A. 908, 908 (1898); *Sutcliffe v. Heatley*, 232 Mass. 231, 122 N.E. 317, 318 (1919); *Wolcott v. Conn. Gen. Life Ins. Co.*, 137 Mich. 309, 100 N.W. 569, 571–72 (1904); *Schultz v. Oldenburg*, 202 Minn. 237, 277 N.W. 918, 921 (1938); *Jamison v. Culligan*, 151 Mo. 410, 52 S.W. 224, 225 (1899); *Sawtelle v. Tatone*, 105 N.H. 398, 201 A.2d 111, 115 (1964); *Robinson v. Kind*, 25 Nev. 261, 62 P. 705, 705 (1900); *Blinn v. Schwarz*, 177 N.Y. 252, 69 N.E. 542, 544–45 (1904); *Ipock v. Atl. & N.C.R. Co.*, 158 N.C. 445, 74 S.E. 352, 353 (1912); *Charles Melbourne & Sons, Inc. v. Jesset*, 110 Ohio App. 502, 163 N.E.2d 773, 775 (1960); *National Gen. Theatres, Inc. v. Bolger*, 266 Or. 584, 514 P.2d 344, 347 (1973); *Der Hagopian v. Eskandarian*, 396 Pa. 401, 153 A.2d 897, 899 (1959); *Williams v. Sapieha*, 94 Tex. 430, 61 S.W. 115, 116–18 (1901); *Trepanier v. Bankers Life & Cas. Co.*, 167 Vt. 590, 706 A.2d 943, 944 (1997); *Upton v. Hall*, 225 Va. 168, 300 S.E.2d 777, 779 (1983); *Morris v. Hall*, 89 W.Va. 460, 109 S.E. 493, 495 (1921); *French Lumbering Co. v. Theriault*, 107 Wis. 627, 83 N.W. 927, 931–33 (1900).

16. *See, e.g.*, 5 WILLISTON ON CONTRACTS § 10:5, at 313 ("With respect to third parties, the contract is considered valid until it has been avoided."); *see also Aetna Life Ins. Co., supra* note 15, 56 N.E. at 98 ("Until disaffirmed, the voidable executed contract, in respect to the property or benefits conveyed, passes the right or title as fully as an unimpeachable contract. By ratification, it becomes impervious; by disaffirmance, a nullity."); *Blinn, supra* note 15, 69 N.E. at 545 ("The deed of a lunatic is not void, in the sense of being a nullity, but has force and effect until the option to declare it void is exercised. The right of election implies the right to ratify, and it may be to the great advantage of the insane person to have that right.").

17. Usually the mentally incapacitated party or his or her representative is the party who will seek to disaffirm or avoid the agreement. However, "if the other party did not know of the incompetency at the time of contracting he cannot be compelled to perform unless the contract is effectively affirmed." RESTATEMENT (SECOND) OF CONTRACTS § 15 cmt. d; *see also id.* at illus. 2 (providing an example of a contract where the competent party may insist on ratification before beginning performance).

18. RESTATEMENT (SECOND) OF CONTRACTS § 7 (1981) ("A voidable contract is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance."). Avoidance is often referred to as disaffirmance, and ratification is often referred to as affirmance; the terms are used interchangeably.

action if by reason of mental illness or defect

> (a) he is unable to understand in a reasonable manner the nature and consequences of the transaction, or
>
> (b) he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition.

(2) Where the contract is made on fair terms and the other party is without knowledge of the mental illness or defect, the power of avoidance under Subsection (1) terminates to the extent that the contract has been so performed in whole or in part or the circumstances have so changed that avoidance would be unjust. In such a case a court may grant relief as justice requires.

RESTATEMENT (SECOND) OF CONTRACTS § 15 (1981). In sum, a voidable contract—unlike a void contract, which has no legal effect—binds both parties unless disaffirmed or avoided by the incapacitated party. Absent fraud or knowledge of the asserted incapacity by the other contracting party, the power of avoidance is subject to limitation based on equitable principles.[19] The power of avoidance also terminates if the incapacitated party, upon regaining capacity, affirms or ratifies the contract.[20] Having explained the relevant legal principles, we proceed to consider whether *Sullivan* should be overruled and the voidable rule adopted in its place.

### B. Overruling Sullivan v. Flynn

■ In considering whether the precedent established in *Sullivan* should be overruled, we examine whether *Sullivan's* rationale still withstands careful analysis.

Concluding that it does not, we first explain why the outcome in *Sullivan* was not compelled by the holding in *Dexter v. Hall,* 82 U.S. (15 Wall.) 9, 21 L.Ed. 73 (1872). Next, we examine the validity of the rationales supporting the void rule: that a mentally incapacitated person is not capable of forming a contract and that the void rule best protects the incapacitated party. Finally, we conclude that the voidable rule better balances the competing interests of protecting the incapacitated party while ensuring the security of transactions.

The court in *Sullivan* reasoned that it was bound by the United States Supreme Court's decision in *Dexter* to hold that the deed of an insane person is void. *Sullivan, supra,* 20 D.C. (9 Mackey) at 401–02. The only issue before the Court in *Dexter* was "whether a *power of attorney* executed by a lunatic is void, or whether it is only voidable." 82 U.S. (15 Wall.) at 20 (emphasis added). Analogizing to contracts involving infants, the Court held that a power of attorney granted by a "lunatic" was void. *Id.* at 25–26. At the time *Dexter* and *Sullivan* were decided, it was common for courts to distinguish powers of attorney from contracts. *See* 5 WILLISTON ON CONTRACTS § 9:5, at 37–44 (observing that although the general rule is that an infant's contract is voidable rather than void, "[a]t one time, certain contracts made by an infant were held void, rather than voidable" and "it has often been asserted and sometimes decided that an infant's power of attorney or agreement to make another his agent is void" (citing, *inter alia, Dexter, supra,* 82 U.S. (15 Wall.) 9). However, the distinction between powers of attorney and contracts is no longer widely accepted. *See* 5 WILLISTON ON CON-

---

**19.** RESTATEMENT (SECOND) OF CONTRACTS § 15 cmt. f; *see also id.* at illus. 5 (providing an example of a contract that ceases to be voidable for equitable reasons).

**20.** RESTATEMENT (SECOND) OF CONTRACTS § 380 (1981).

TRACTS § 9:5, at 46–47 ("[T]he better view has been to treat the creation of an agency by a minor like other agreements made by infants, as merely voidable....") (citing, *inter alia*, RESTATEMENT (SECOND) OF AGENCY § 20 (1958) ("A person who has capacity to affect his legal relations by the giving of consent has capacity to authorize an agent to act for him with the same effect as if he were to act in person."))); 12 WILLISTON ON CONTRACTS § 35:1, at 202 (4th ed. 2012) ("An agency contract is formed according to the same rules that are applicable to any other contract; an agency is created in much the same manner as a contract is made, in that the agency results from an agreement between the principal and the agent to serve in that capacity."); *see also* RESTATEMENT (SECOND) OF AGENCY § 32 (1958) ("Except to the extent that the fiduciary relation between principal and agent requires special rules, the rules for the interpretation of contracts apply to the interpretation of authority."). In the years following *Dexter*, there was disagreement over whether it should be interpreted narrowly, to apply only to powers of attorney, or broadly to encompass other contracts.[21] That the Supreme Court did not intend to establish a sweeping rule that all contracts of mentally incapacitated persons are void is demonstrated by the Court's decision in *Luhrs v. Hancock*, 181 U.S. 567, 21 S.Ct. 726, 45 L.Ed. 1005 (1901), where the Court observed, without even addressing *Dexter*, that "[t]he deed of an insane person is not absolutely void; it is only voidable; that is, it may be confirmed or set aside." 181 U.S. at 574, 21 S.Ct. 726 (citation omitted). However, *Luhrs* is not binding on this court and therefore does not replace *Sullivan* as the law of the District of Columbia.[22]

**21.** *Compare Kevan v. John Hancock Mut. Life Ins. Co.*, 3 F.Supp. 288, 290 (W.D.Mo.1933) ("[T]he reference in the [*Dexter*] opinion to contracts generally is clearly dictum."), *and Wolcott v. Conn. Gen. Life Ins. Co.*, 137 Mich. 309, 100 N.W. 569, 571 (1904) ("[T]he Supreme Court, in *Dexter v. Hall*, held that the power of attorney of a lunatic was void, and rested their decision on the analogy existing between the rights of infants and those of lunatics, and say, 'In fact, we know no case of authority in which the letter of attorney of either an infant or a lunatic has been held merely voidable.' This they could not have said respecting deeds of conveyance, as the Reports of the state court contain numerous decisions affirming the view that the deed of a lunatic is not void, but only voidable."), *and French Lumbering Co. v. Theriault*, 107 Wis. 627, 83 N.W. 927, 933 (1900) (holding that the deed of an "insane person" is voidable, not void, and criticizing cases that read *Dexter* to apply to more than powers of attorney), *with Daugherty v. Powe*, 127 Ala. 577, 30 So. 524, 525 (1900) ("One of the essential elements to the validity of a contract is the concurring assent of two minds. If one of the parties to a contract is insane at the time of its execution, this essential element is wanting. The principle is the same whether the contract rests in parol or be by deed. A deed executed by a person non compos mentis is absolutely void." (citing, *inter alia*, *Dexter, supra*, 82 U.S. (15 Wall.) 9)), *and* Milton D. Green, *The Operative Effect of Mental Incompetency on Agreements and Wills*, 21 TEX L. REV. 554, 558–59 (1943) ("The case [*Dexter v. Hall*] involved a power of attorney, and hence some authorities have interpreted it strictly and limited its application to such instruments. However, it is more generally thought to have embodied a principle applicable to all contractual or consensual acts." (footnotes omitted)).

**22.** As *amici* in this case point out, had the highest court of the District of Columbia had the opportunity post-*Sullivan*, but pre-*Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to revisit the void vs. voidable issue, there is little doubt that the court would have conformed the law in the District of Columbia to the rule set forth in *Luhrs* that contracts made by mentally incapacitated persons are voidable and not void, just as courts in other jurisdictions did in the wake of *Luhrs* (which arose in Arizona). *See, e.g., Beale v. Gibaud*, 15 F.Supp. 1020, 1027–28 (W.D.N.Y.1936); *Levine v. Whitney*, 9 F.Supp. 161, 162 (D.R.I.1934); *Christian v. Waialua Agric. Co.*, 31 Haw. 817, 877–79

The court in *Sullivan* acknowledged that contracts generally, as opposed to powers of attorney specifically, were not at issue in *Dexter*; nonetheless, the *Sullivan* court felt "bound to recognize, in so full and careful a discussion, a deliberate intention of the [*Dexter*] court to establish a rule."[23] 20 D.C. (9 Mackey) at 402. Although *Dexter* did not actually hold that all contracts entered into by mentally incapacitated persons are void, and therefore did not compel the *Sullivan* court to hold such, *Dexter* did use some broad language (dictum) to explain the rationales used to support the void rule.

Next, we examine the rationales commonly used to support the void rule, as explained by the Court in *Dexter*: 1) that a mentally incapacitated person cannot enter into a valid contract because to do so "requires the assent of two minds" and a mentally incapacitated person "has nothing which the law recognizes as a mind;" and 2) that a mentally incapacitated person, unlike an infant, will never gain the mental capacity necessary to avoid a contract and therefore "has no protection if his contract is only voidable." *Dexter, supra,* 82 U.S. (15 Wall.) at 20–21.[24] As we discuss below, these rationales no longer comport with

(Haw.1931), *rev'd,* 93 F.2d 603 (9th Cir.1937), *rev'd,* 305 U.S. 91, 59 S.Ct. 21, 83 L.Ed. 60 (1938). But the highest court of our jurisdiction did not have that opportunity in the period between *Luhrs* and *Erie,* and thus never overruled *Sullivan* (with the result that the three-judge division of this court was bound by *Sullivan* ). *See Raley v. Life and Cas. Ins. Co. of Tenn.,* 117 A.2d 110, 111 (D.C.1955) (concluding that "whatever the effect of the [pre-*Erie* Supreme Court ruling declaring substantive common law] in the [state] where the case arose, it cannot be said [after the decision in *Erie*] to have declared general common law or to be binding on State or Federal courts generally"). And, of course, post-*Erie,* our court is not obligated to follow *Luhrs. See Erie,* 304 U.S. at 78, 58 S.Ct. 817 ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern."). As an en banc court, we may revisit the question of what the law is for this jurisdiction on the void vs. voidable issue and must determine for ourselves whether to adhere to, or instead abandon, the rule of *Sullivan.* The instant case presents us with our first opportunity to do so in the specific context of a contract where the incapacitated party had not already been judicially determined to be mentally incapacitated or committed to a mental institution at the time the contract was made. See *infra* note 36.

**23.** The *Sullivan* court also noted that it would have adopted the void rule in any event. The

court observed that the voidable rule, as articulated by some American courts in relation to deeds, was the result of "the omission of Sir William Blackstone to observe that authoritative decisions had distinguished these deeds from the ancient feoffments with the livery of seisin, and that it should have been considered, even in his time, settled that they were absolutely void, while feoffments were voidable only." *Sullivan, supra,* 20 D.C. (9 Mackey) at 402. We need not address Sir William Blackstone's supposed error here. Even if the law in England supported the *Sullivan* court's decision, the void rule and its underlying rationales "are unsuited to modern experience" and "no longer adequately serve the interests of justice," as we will address below, and therefore we do not feel constrained to continue following the rule, no matter how ancient its roots. *Carl, supra,* 702 A.2d at 178–79 (Schwelb, J., concurring) (quoting *Beaulieu, supra,* 265 A.2d at 613). Appellant urges us to continue to follow the void rule set forth in *Sullivan,* stressing that the void rule has been the law in the District of Columbia for the past 119 years. However, "the law cannot remain static; it must be permitted to evolve with the changing complexion of society and the developing sciences." *Bethea v. United States,* 365 A.2d 64, 72 (D.C.1976).

**24.** Another possible explanation for the void rule has been posited:

One reason older cases talked of such contracts as void is that only by doing so could a court of law, as distinguished from equity, grant relief. The law courts could not administer equitable relief, such as requiring

modern contract law and modern understandings of mental illness.

### 1. Contract Formation

Implicit in the holdings of both *Dexter* and *Sullivan* is the premise that formation of a contract requires the mental assent of the parties involved, or a "meeting of the minds." [25] Under this subjective theory of contract formation, it would seem logical to conclude that if one of the parties lacked a sufficient "mind" there could be no such mental assent or "meeting of the minds" and therefore no contract. Weihofen, *supra* note 24, at 230. The question of whether a party's actual mental assent was necessary to the formation of a contract was the subject of a "significant doctrinal struggle in the development of contract law" between subjective theorists, who argued that a "meeting of the minds" was necessary to contract formation, and objective theorists, who took the view that "[t]he *expression* of mutual assent, and not the assent itself, was the essential element in the formation of a contract." *Newman v. Schiff*, 778 F.2d 460, 464 (8th Cir.1985) (emphasis added). "By the end of the nineteenth century, the objective theory had become ascendant and courts universally accept it today." 1 E. ALLAN FARNS-WORTH, FARNSWORTH ON CONTRACTS § 3.6, at 210 (3d ed. 2004); *see also Hart v. Vermont Inv. Ltd. P'ship*, 667 A.2d 578, 582 (D.C.1995) (observing that the District of Columbia follows the objective law of contracts) (citation omitted). The basis for the void rule—that a mentally incapacitated person has no "mind" and is incapable of mental assent—"has given way to . . . the doctrine that contractual obligation depends on *manifestation* of assent rather than on mental assent [or meeting of the minds]." RESTATEMENT (SECOND) OF CONTRACTS § 15 cmt. a (emphasis added).

To continue to adhere to the Court's rationale in *Dexter*, and by extension *Sullivan*, one also has to accept the premise that "a lunatic, or a person *non compos mentis*, has nothing which the law recognizes as a mind. . . ." [26] 82 U.S. (15 Wall.) at 20. The notion that a person either does or does not have a "mind" has given way to a more nuanced understanding of mental capacity. [27] Courts have recognized that a person who is declared incapacitated

---

reconveyance or restoration. To protect the incompetent, the courts had to call the contract or deed void in order to hold that the incompetent had not parted with title or made a binding promise.

Henry Weihofen, *Mental Incompetency to Contract or Convey*, 39 S. CAL. L. REV. 211, 231 (1966). To the extent that this reason motivated courts to find contracts void, it is no longer necessary because law and equity have merged. *See, e.g.*, Green, *supra* note 21, at 574 ("There is no such impediment in our liberalized modern procedure.").

**25.** *See* Green, *supra* note 21, at 559 ("[The subjective] theory of the basis of contract used to have widespread acceptance and at such a time it was perfectly natural that it should serve as the major premise in a syllogism dealing with the operative effect of mental incompetency.").

**26.** In England, "[p]ersons with intellectual/mental disabilities were divided into two classes: the idiot, who had never had capacity, and the lunatic, 'a person who hath had understanding but . . . has lost the use of his reason.'" Kristin Booth Glen, *Changing Paradigms: Mental Capacity, Legal Capacity, Guardianship, and Beyond*, 44 COLUM. HUM. RTS L. REV. 93, 103 (2012) (citations omitted).

**27.** *See, e.g.*, Green, *supra* note 21, at 560–61 ("Suffice it to say for present purposes that presence or absence of 'mind' is nowhere used as the test of mental incompetency at the present time. The test is the *degree* of capacity for understanding possessed by the individual. If he fails to possess this degree of capacity for understanding, we say he is incompetent, but because we are measuring his understanding in terms of degree we are assuming that, although incompetent, he has some capacity for understanding, but not

"may be subject to varying degrees of infirmity or mental illness, not all equally incapacitating." 5 WILLISTON ON CONTRACTS § 10.3, at 296; *see also Cundick v. Broadbent*, 383 F.2d 157, 160 (10th Cir.1967) (recognizing "different degrees of mental competency" when addressing whether a contract could be voided for lack of capacity). Furthermore, a person may have some capacity to contract and its existence in a specific case may depend on the nature of the particular transaction at issue.[28] Thus, the first rationale supporting the void rule—that a mentally incapacitated person "has nothing which the law recognizes as a mind" and therefore cannot form a contract—no longer withstands careful analysis in light of changes in contract law and evolving understanding of the complexities of mental illness.

### 2. *"Protection" of the Party with a Mental Illness or Defect*

The other rationale relied on by *Dexter* and incorporated in *Sullivan* is that a mentally incapacitated person, unlike an infant, will never regain the mental capacity necessary to avoid a contract and therefore "has no protection if his contract is only voidable." *Dexter, supra*, 82 U.S. at 20–21. This rationale is based upon an outdated understanding of mental illness and of what it means to "protect" mentally incapacitated persons.

At the time *Dexter* and *Sullivan* were decided, "idiocy" and "lunacy" were primarily understood to be permanent conditions.[29] Therefore, the view that a mentally incapacitated person would never gain the mental capacity necessary to avoid a contract made some sense, although it overlooked the fact that the contract could also be avoided by a guardian or, after death, by a personal representative. *See* RESTATEMENT (SECOND) OF CONTRACTS § 15 cmt. d. Evolving understanding of mental illness and advances in medicine have shown that mental capacity can vary over

---

enough. And from a practical standpoint, we know, and psychiatrists know, that insanity is a matter of degree, and that one may be insane and still have some understanding." (footnotes omitted)).

28. *See* RESTATEMENT (SECOND) OF CONTRACTS § 12(1) ("Capacity to contract may be partial and its existence in respect of a particular transaction may depend upon the nature of the transaction or upon other circumstances."); *see, e.g., Butler v. Harrison*, 578 A.2d 1098, 1100–01 (D.C.1990) ("The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the particular transaction in which she is engaged ... whether or not she is competent in transacting business generally.... [T]he party asserting incompetency must show not merely that the person suffers from some mental disease or defect such as dementia, but that such mental infirmity rendered the person incompetent to execute the particular transaction...." (citations omitted)).

29. *See* David L. Braddock & Susan L. Parish, *Social Policy Toward Intellectual Disabilities in the Nineteenth and Twentieth Centuries, in* THE HUMAN RIGHTS OF PERSONS WITH INTELLECTUAL DISABILITIES 83, 86 (Stanley S. Herr, Lawrence O. Gostin & Harold Hongju Koh eds., 2003) (discussing the history of mental institutions and observing that "[i]n the later decades of the 1800s, as treatment gave way to confinement and custodial care in larger facilities, cure rates concomitantly dropped and psychiatrists reported that mental illness was largely incurable.... By the late 1800s, the earlier optimism of rehabilitating patients with mental illness and sending them back to their home communities had been replaced with a rigid pessimism that decried the possibility of cure...."); ALLISON C. CAREY, ON THE MARGINS OF CITIZENSHIP: INTELLECTUAL DISABILITY AND CIVIL RIGHTS IN TWENTIETH-CENTURY AMERICA 39 (2009) (discussing early American restrictions on "incompetents" and observing that "[t]he adjudication process assumed incompetence to be a permanent and pervasive trait of the individual....").

time and is susceptible to significant improvement with treatment. *See, e.g., Trepanier v. Bankers Life & Cas. Co.*, 167 Vt. 590, 706 A.2d 943, 944 (1997) (recognizing that certain types of incapacity are only temporary); *Street v. Street*, 211 P.3d 495, 499 (Wyo.2009) ("Mental incapacity is not always permanent and a person may have lucid moments or intervals when that person possesses the necessary capacity to convey property."); *cf. Wallace v. United States*, 936 A.2d 757, 769 (D.C.2007) (recognizing that a defendant may regain competence to stand trial). Therefore, having the choice of whether to follow through on a contract or avoid it can be very beneficial to a person who entered into the contract during a period of incapacity. *See, e.g., Blinn v. Schwarz*, 177 N.Y. 252, 69 N.E. 542, 545 (1904) ("If the deed or contract is void, it binds neither party, and neither can derive any benefit therefrom; but, if voidable, the lunatic, upon recovering his reason, can hold onto the bargain if it is good, and let go if it is bad.").

*Dexter*, upon which *Sullivan* was predicated, relies on an outdated understanding of what it means to "protect" a person with a mental illness or defect. Whereas people with mental illnesses were once stigmatized and segregated from the rest of society as a common form of "treatment,"[30] modern statutes focus on protecting the civil and legal rights of people with mental illnesses and on encouraging participation in society. The policy of the District of Columbia is that residents with intellectual disabilities "shall have all the civil and legal rights enjoyed by all other citizens." D.C.Code § 7–1301.02(a)(1) (2012 Supp.).[31] For example, commitment to a residential facility of the Department of Health is permitted only when it is "the least restrictive alternative consistent with the best interests of the person and the public." D.C.Code § 21–545(b)(2) (2004 Supp.). Consistent with that policy, the voidable rule better "protects" mentally incapacitated persons by facilitating meaningful participation in society. If the contracts of mentally incapacitated persons are void, rather than voidable, their legal "protection" is the opposite of what it should be—"[i]t would be a handcuff instead of a shield." *Breckenridge's Heirs v. Ormsby*, 24 Ky. (1 J.J. Marsh.) 236, 239 (1829). Similarly, by limiting the ability to disaffirm the contract to the mentally incapacitated party or her representative, the voidable rule protects against cases in

**30.** One author summarized part of this history as follows:

> In the nineteenth and first half of the twentieth century, however, the primary social and legal policy for persons with intellectual and psycho-social disabilities was institutionalization. Beginning with well-intentioned experimental schools, economic and other forces led quickly to custodial asylums with reduced emphasis on educating residents and returning them to community life. By the beginning of the twentieth century, poor farms or almshouses were also a significant aspect of state provision for people with intellectual disabilities.
>
> The segregation of this population was accompanied by, and in large part generated, a particularly virulent medical model fueled by Social Darwinism. According to this

model, persons with intellectual disabilities suffered from a hereditary, incurable disease that led to criminality, immorality or depraved behavior, and pauperism, all of which constituted an unacceptable drain on society.

Booth Glen, *supra* note 26, at 104 (footnotes and internal quotation marks omitted).

**31.** The D.C. Code, including this section, was recently amended by the People First Respectful Language Modernization Amendment Act of 2012, which "remove[s] offensive, dated language referring to persons with disabilities, including the term mental retardation, and replace[s] it with respectful language that puts people first." 2012 District of Columbia Laws 19–169 (Act 19–361).

which the other contracting party seeks to take advantage of an individual's mental incapacity to avoid an otherwise fair and enforceable contract.[32] If the contracts of a mentally incapacitated person are treated as void, the competent party to the contract would not need to perform even if the incapacitated party is ready to, or already has, performed the bargain. 5 WILLISTON ON CONTRACTS § 10.2, at 279.

Determining how to treat the contracts of mentally incapacitated persons requires the reconciliation of two conflicting policies: "the protection of justifiable expectations and of the security of transactions, and the protection of persons unable to protect themselves against imposition." RESTATEMENT (SECOND) OF CONTRACTS § 15 cmt. a. We have already discussed how the voidable rule better serves the second policy. The voidable rule also better serves the first policy of creating greater certainty for real property and other commercial transactions. Under the *Sullivan* rule, because a mentally incapacitated person's contract is inherently void, the competent contracting party and others with rights dependent on that party cannot obtain the benefit of their bargain, regardless of the inequities (although he or she may still have some remedy based on a quasi-contract theory). *See, e.g., Nevin v. Hoffman,* 431 F.2d 43, 47 (10th Cir.1970) ("[I]f a deed is absolutely void, a subsequent bona fide purchaser obtains nothing despite his innocence."); *Metro. Life Ins. Co. v. Bramlett,* 224 Ala. 473, 140 So. 752, 754 (1932) (explaining that because the contracts "of an insane person" are inherently

void, "one who contracts with an insane person takes nothing, though ignorant of his insanity, and though he paid value, and his contract is valid for no purpose"). The Restatement rule, by contrast, instructs a court to "grant relief as justice requires." RESTATEMENT (SECOND) OF CONTRACTS § 15(2). Under this rule, a contract might be enforced despite one party's incapacity where the other party had no reason to know of the incapacity and has substantially performed, cannot recover his or her consideration, or would otherwise suffer hardship. *See* RESTATEMENT (SECOND) OF CONTRACTS § 15 cmt. f & illustrations thereto (discussing situations in which avoidance would be inequitable).

Because we conclude that the void rule relies on an outdated theory of contract formation and outdated understandings of mental illness, we overrule the holding of *Sullivan v. Flynn,* 20 D.C. (9 Mackey) 396 (1892), that contracts entered into by mentally incapacitated persons are inherently void. In its place, we adopt the voidable rule as set forth in the Restatement (Second) of Contracts § 15, which better balances the competing interests of ensuring the security of transactions and enabling mentally incapacitated persons to participate in society, while protecting them from unfair imposition.

## III. Application of the Voidable Rule to This Case

In the instant case, Ms. Speleos was found to have been incapacitated at the time she entered the lease with appellees.[33]

---

**32.** Under certain circumstances the other contracting party cannot be compelled to perform unless the contract is effectively affirmed. See *supra* note 17.

**33.** Judge Duncan–Peters based this finding partially on Judge Christian's earlier declaration that Ms. Speleos was incompetent to handle her own affairs in November 2001.

Judge Christian found Ms. Speleos to be "an adult whose ability to receive and evaluate information effectively or to communicate decisions is impaired to such an extent that ... she lacks the capacity to take actions necessary to obtain, administer, and dispose of real and personal property...." Thus, after Ms. Speleos entered the lease transaction with the

Therefore, the contract was voidable at the election of Ms. Speleos or her representative unless avoidance of the contract would be unjust. *See* RESTATEMENT (SECOND) OF CONTRACTS § 15 cmt. f ("If the contract is made on fair terms and the other party has no reason to know of the incompetency, performance in whole or in part may so change the situation that the parties cannot be restored to their previous positions or may otherwise render avoidance inequitable. The contract then ceases to be voidable.").[34] Here, the trial court upheld the lease based on its determination that the lease was voidable and its finding that Ms. Speleos or her representatives did not effectively avoid or disaffirm the lease. Because the division was bound by the *Sullivan* rule deeming contracts entered into by mentally incapacitated persons void, the division did not reach 718 Associ-

ates' arguments challenging the finding that the contract had not been disaffirmed.[35] Now, as an en banc court we overrule *Sullivan* and join a majority of jurisdictions in holding that contracts entered into by mentally incapacitated persons are voidable, rather than inherently void. As a result, we remand to the division to consider whether the trial court erred in determining that the lease between Ms. Speleos and appellees was never disaffirmed.[36]

*So ordered.*

Bankses, it was determined that at the time she entered into that transaction, she was "unable to understand in a reasonable manner the nature and consequences of the transaction"—a lease of real property with the opportunity to purchase. RESTATEMENT (SECOND) OF CONTRACTS § 15(1)(a).

34. The trial court did not reach the issue of whether avoidance would be inequitable in this case because it found that Ms. Speleos and her representatives did not avoid or disaffirm the lease.

35. On appeal to the division, 718 Associates also argued that "even assuming that the lease was not inherently void, the trial court's judgment still rests upon an error of law as well as two clearly erroneous findings of fact." *718 Assocs., supra,* 21 A.3d at 981 n. 9. 718 Associates argued "that the trial court misapprehended the law when it reasoned that the Estate needed to have specific knowledge of appellees' lease in order to disaffirm it." *Id.* Additionally, 718 Associates claimed "that the following factual findings were clearly erroneous: (1) that [Ms. Speleos's] conservator never made an unequivocal disaffirmance; and (2) that the Estate did not know about appellees' lease when the affidavit was executed." *Id.*

36. Importantly, Ms. Speleos had not already been adjudicated by the court as incapacitated or appointed a guardian when she entered into the lease agreement with the Bankses. Therefore, the question of what effect an adjudication of incapacity or appointment of a guardian has on a person's ability to contract is not squarely before us. *Martin II,* decided in 1970, held that a contract entered into by a person who had already been adjudicated incompetent and committed to a mental institution was void. 270 A.2d at 143. However, current statutes regarding capacity and guardianship attempt to "encourage the development of maximum self-reliance and independence of the incapacitated individual." D.C.Code § 21–2044 (2011 Supp.); D.C.Code § 21–2055 (2001). This preference for self-reliance is reflected in the Code provision, adopted in 1987, regarding the effect of a finding of incapacity, which provides:

> A finding under this chapter that an individual is incapacitated shall not constitute a finding of legal incompetence. An individual found to be incapacitated shall retain all legal rights and abilities other than those expressly limited or curtailed in the order of appointment of a guardian or in a protective proceeding, or subsequent order of the court.

D.C.Code § 21–2004 (2001). The policy subsequently adopted by the District of Columbia

Council is therefore arguably in tension with the holding of *Martin II* and the rule expressed in the Restatement § 13 that a person "has no capacity to incur contractual duties if his property is under guardianship by reason of an adjudication of mental illness or defect." RESTATEMENT (SECOND) OF CONTRACTS § 13 (1981). However, the effect that an adjudication of incapacity or the appointment of a guardian has on a person's ability to contract, in light of the current statutory framework, is a question that will need to be decided when the issue is properly presented.